**UNITED STATES, Appellee**

v

**ULYSSES G. BASS, Sergeant, U. S. Army, Appellant**

8 USCMA 299, 24 CMR 109

No. 9410

Decided October 11, 1957

*First Lieutenant Robert J. Hearon, Jr.*, argued the cause for Appellant, Accused. With him on the brief was *Major Frank C. Stetson*.

*First Lieutenant Arnold I. Burns* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant William K. Davenport*.

## Opinion of the Court

HOMER FERGUSON, Judge:

On the afternoon of June 20, 1956, a house in Yokohama, Japan, known to be operating as a narcotics dispensing cell, was placed under surveillance by two Criminal Investigation Detachment agents. The accused, together with a Japanese girl friend, who was known to be a narcotics addict, approached the house. The girl entered, while the accused remained outside. The agents suspected that the couple was there for the purpose of securing narcotics. After remaining in the house approximately five minutes, the girl rejoined the accused and together they proceeded to a Japanese hotel located several hundred yards from the house. The agents followed the couple to the hotel and stationed themselves outside. Several minutes later they entered the hotel, identified themselves to a Japanese woman in charge, and asked to speak to the American soldier who had entered a short while before. The woman escorted them to the second floor of the hotel and opened the door to a room without being asked to do so by the agents. The accused was seen standing in the center of the room holding an unlit cigarette in his hand while the Japanese girl was seen lying across a bed. When the door was opened, the accused looked up and made a motion with his hand toward an open window in the room. The agents noticed "a white powdery mist" around the accused and were under the impression that he had just thrown something out of a window. The accused was first placed under apprehension and then searched. A small white paper packet, which had been opened, was found on the ledge outside the window of the room, and an unopened packet was found lying near the accused's feet. The accused was then placed in a car where he was advised of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. He was taken to the Criminal Investigation Detachment office where he furnished the agents with a urine specimen. A second specimen was obtained the following day. Laboratory analyses later revealed that the two packets contained a habit-forming narcotic drug and that the first urine specimen was found to be positive for morphine. The specimen obtained on the day following the apprehension was

300

found to be negative for morphine. The accused was subsequently tried and convicted on the charge of having wrongfully possessed and used narcotic drugs in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934.

The accused's primary assault on his conviction lies in his contention that the search of the hotel room was illegal and that the narcotics seized and the urine specimens subsequently obtained were the products of the illegal search and therefore inadmissible. The secondary assault upon his conviction is the claim that the chain of custody of the urine specimens was broken, thereby rendering invalid the results of the scientific tests performed. We first direct ourselves to the question relating to the issue of search and seizure.

At trial the accused objected to the testimony of the agent concerning the events that had transpired within the room. His objection was based on a claim that the agent's entry into the room was illegal. The law officer sustained the objection. The prosecution then interrogated the agent concerning his failure to first obtain a search warrant. The agent testified that it would have taken him "at least a couple of days" to obtain a search warrant and by that time "the girl and the soldier would have left the hotel." No attempt had been made to contact the accused's commanding officer because the identity of the accused was unknown. The agent further testified that he had entered the room for the purpose of apprehending the accused in the act of possessing and using narcotic drugs. The prosecution again sought permission from the law officer to allow the agent to testify concerning what he had observed in the room. The defense again objected, contending that the Administrative Agreement between the United States and Japan provides for the obtaining of a search warrant where Japanese property is to be searched, "or at least the company of a Japanese policeman." The defense objection was again sustained. The agent was then examined concerning the reason why he had not sought a Japanese policeman to accompany him to the room. The agent replied that he had had "no opportunity to leave and search for a policeman, because we wanted to know where he [the accused] was going," and furthermore he did not believe a Japanese policeman could understand him without the benefit of an interpreter. The prosecution once again sought to introduce testimony concerning what had transpired within the room, the defense counsel once again objected and the law officer once again sustained the objection. The law officer, however, permitted evidence concerning the contents of the urine specimen to be admitted under the theory that such evidence was "obtained as a result of information from an independent source."

The accused took the stand in his own behalf and testified concerning his version of the incident. He testified that he was stationed in Korea but had arrived in Japan two days prior to the incident in question, pursuant to leave. The day following his arrival in Japan, he "got a room at the R & R Center." While in Yokohama, he met a Japanese girl, whom he had met several years before. That she was a narcotics addict was well known to him and he offered as a reason for being in her company the fact that a narcotics addict is "the cheapest thing you can buy." On the following day he again met the Japanese girl and together they went to a house where she claimed she was staying. He was asked to remain outside while she entered the house and remained there approximately a half hour. Before entering the house he had given her 500 yen. When she came out, he inquired concerning why she had been so long and she replied that she "was taking a shot." He knew what she meant by this statement. Together, they then proceeded to a nearby coffee shop, where they had some iced coffee and smoked some cigarettes, and from there they went to a hotel. Upon entering the hotel, the girl went upstairs "and she went into a room, and I followed her." The bed sheet had some blood on it and the girl "told the papa-san to go get a sheet so she could change the bed, and he went down and he got a sheet and we made up the bed." After lying on the bed for about three minutes he got up to light a cigarette, and when he stood

301

up, "that's when the CID walked in."

He denied using narcotics in any form but was unable to account for the presence of morphine in his system. On cross-examination, he testified that when the agents entered he had just thrown an empty cigarette package out of the window. He had never seen the two packets of morphine prior to their discovery by the agents and claimed no property interest in them. Following the accused's testimony, the Criminal Investigation Detachment agent again took the stand and this time testified without objection concerning the events that had transpired within the room. The substance of this testimony has previously been set forth at length.

## I

We find it totally unnecessary to determine whether the search and seizure here involved was unlawful ▮▮ or whether the law officer's rulings were correct. In our view the accused simply has no standing to complain. The evidence abundantly shows that the accused had no property right in the goods seized or the premises searched, nor is any claimed by him. On the contrary, he disclaimed all property interest in the narcotics seized and by his own testimony acknowledged that he was staying at the "R & R Center." He had further testified that he had followed the Japanese girl to the hotel room and had been there but a short while before the Criminal Investigation Detachment agents arrived. Furthermore, there is no claim that the accused was either registered in the hotel room, paid the rent, or had given the Japanese girl money to do so. In the absence of a claim of some interest in the premises searched, or the property seized, the accused cannot urge the constitutional protection against unreasonable seizures. The law is well settled that the guarantee of the Fourth Amendment to the Constitution[1] is a personal right or privilege that can only be availed of by the owner or claimant of the property subjected to unreasonable search and seizure. A review of the pertinent Federal cases amply supports the conclusion we reach.

In the case of In re Nassetta, 125 F2d 924 (CA2d Cir) (1942), the accused was a temporary visitor at premises upon which an illicit still was found by officers who had searched the premises without a warrant. The house was occupied as a residence by the accused's uncle, and the accused claimed to be a visitor in the house. He asserted no interest therein nor in the property seized. On appeal from a dismissal of a motion to suppress the evidence, the Court of Appeals of the Second Circuit said that:

"With practical unanimity the circuit courts of appeal have ruled that one who has no proprietary or possessory interest in the premises searched or property seized may not suppress evidence obtained by a search and seizure violative of the rights of another."

In Lovette v United States, 230 F2d 263 (CA5th Cir) (1956), the accused was convicted of illegal possession of sixteen gallons of distilled spirits without having affixed to the containers thereof revenue stamps as required by law. The accused denied any interest in or claim to the premises searched or the liquor seized. In rejecting her contention that she had been subjected to an unreasonable search and seizure, the Court of Appeals for the Fifth Circuit said in pertinent part:

". . . the defendant, having disclaimed interest in, or possession of, the premises searched and the property seized, could not be heard to invoke the personal privilege of the Fourth Amendment, it is sufficient to say that no point of law is more firmly settled than that the guarantee of

[1] The Fourth Amendment reads as follows:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

302

the Fourth Amendment against unreasonable searches and seizures is personal and can be raised only by one who, at the least, claims ownership or possession of, or connection with the premises searched or the property seized. The cases so holding are legion."

For similar holdings from the other United States Courts of Appeals see Grainger v United States, 158 F2d 236 (CA4th Cir)(1946); Holt v United States, 42 F2d 103 (CA6th Cir)(1930); United States v Eversole, 209 F2d 766 (CA7th Cir)(1954); Patterson v United States, 31 F2d 737 (CA9th Cir)(1929); and Baskerville v United States, 227 F2d 454 (CA10th Cir)(1955).

A case closely in point to the instant case is Gaskins v United States, 218 F2d 47 (CA DC Cir)(1955). The accused there was convicted of several narcotics violations. The evidence showed that the apartment of her husband had been searched without a search warrant. It was even necessary to use violence to gain entrance to the apartment. As the police entered, the accused rushed to the bathroom and attempted to dispose of three envelopes containing narcotics but was prevented from doing so by the officers. She was arrested and other drugs were found on her person. On appeal she contended she was merely a guest in the apartment which had been illegally entered and disclaimed any ownership of the drugs illegally seized. The Court of Appeals for the District of Columbia held that since her "personal rights were not violated, she has no standing to contend the entry and subsequent seizure were unlawful." Accord, Gorland v United States, 197 F2d 685 (CA DC Cir) (1952); Shaw v United States, 209 F2d 298 (CA DC Cir)(1953).

The Supreme Court has never decided the problem presented in the case at bar. In United States v Jeffers, 342 US 48, 72 S Ct 93, 96 L ed 59, the accused had stored narcotics in a hotel room occupied by two aunts. Police officers entered the hotel room while no one was there and a search of the premises and seizure of the narcotics were effected without warrant or arrest. On the following day the accused was arrested, at which time he claimed ownership of the narcotics seized. The Government argued that the search did not invade the accused's privacy and that he therefore lacked the necessary standing to suppress the evidence seized. In rejecting this contention, the Supreme Court held that the accused "unquestionably had standing to object to the seizure made without warrant or arrest" and even though the goods seized were contraband, the accused did have sufficient property rights therein for purposes of the exclusionary rule. Cf. Hobson v United States, 226 F2d 890 (CA8th Cir)(1955), where a package of heroin was seized from the accused's home as a result of an illegal search. Although he specifically disclaimed ownership in the contraband goods which had been seized, the fact that they were taken from his home was considered "sufficient to give the defendant proper standing to move for the suppression of the seized evidence."

Whether or not the agents violated provisions of the Administrative Agreement entered into between the United States and Japan by exceeding the limitations contained therein respecting searches and seizures within Japan is not for us to determine. Cf. United States v Ball, 8 USCMA 25, 23 CMR 249. Accordingly, we conclude that in the absence of any proprietary or possessory interest in the premises searched or property seized, the accused has no standing to complain.

II

Turning now to the question concerning the chain of custody of the urine specimens obtained from the accused, the record of trial establishes the following facts. After the accused was apprehended and taken to the Criminal Investigation Detachment office, a urine specimen was obtained from him. A second specimen was obtained the following morning. Both specimens were given to the agent who had apprehended the accused. The agent testified that he sealed both bottles with paraffin and adhesive tape, etched his initials, the hour, the date, and the accused's name on the bottles, and turned them over to

one Private First Class May for delivery to the medical laboratory for analysis. The agent identified the bottles which had been admitted into evidence as those which had contained the specimens.

Private First Class May was neither present at trial nor testified by deposition concerning the receipt of the bottles from the agent. There was testimony that May had been transferred to the United States some six weeks prior to trial. The defense voiced no objection to the failure of the prosecution to produce May as a witness. The accused now argues that the chain of custody of the specimens was "defective" because of May's failure to testify at trial, thereby rendering the scientific tests performed thereon legally irrelevant. We find this argument unpersuasive. We believe the specimens were properly admitted into evidence and that May's failure to testify was not fatal to the Government's case. Further reference to the record of trial amply supports our conclusion.

At trial, the prosecution and the defense, with the express consent of the accused, entered into a stipulation of testimony. It was therein stipulated that if one Nakamura, a civilian employee with the Toxicology Section, 406th Medical General Laboratory, were present in court, he would testify under oath as follows: That on June 22, 1956 (the day after the specimens were turned over to May), he received two bottles—subsequently admitted into evidence—from Private First Class May; each of the bottles purported to contain urine and the top of each bottle "was covered with tape which was in turn covered with wax and that these covers appeared to be intact at that time;" that the chain of custody sheet was tendered to him by May and that he had observed that May's signature had already been placed thereon; that these specimens were received in order to make a laboratory determination as to whether their contents contained narcotic drugs and that the specimens were then turned over to Specialist Third Class Rukats for further disposition. There was also a stipulation that if

Specialist Third Class Rukats were in court, she would testify under oath that: She received two specimens from Nakamura on June 22, 1956, and that, in accordance with established laboratory procedure, she logged these exhibits into the laboratory giving them a laboratory number, which had never previously been used; that she placed a laboratory number on each bottle and that she then placed the labelled bottles into a refrigerator located in the Toxicology Section, and placed the accompanying paper work, which she had prepared, in Lieutenant Prouty's file.

One Komaki, a laboratory technician in the Toxicology Section, testified that on June 22, 1956, he had taken the two specimens from the refrigerator with the seals still intact. He opened the seal on each bottle and measured the contents. An experiment was then conducted with a sample taken from each bottle. The serial numbers on the bottles he had received were the same as the serial numbers on the bottles admitted into evidence. Next, the prosecution called one Marilyn Moorhead, a medical technician assigned to the laboratory. She testified that she had received the specimens from Komaki and had performed additional tests on the contents, after which she had given the specimens to Lieutenant Prouty, Chief of the Toxicology Section. Lieutenant Prouty then testified that he had received the specimens from Miss Moorhead and after performing additional tests and analyses—the nature of which was fully developed at trial—he concluded that the first specimen was positive for morphine whereas the second specimen was negative.

We believe the Government in this case has adequately established the necessary links in the chain of custody between the time the agents obtained the specimens from the accused and their production in court. The general rule is that a specimen taken from a human body for the purpose of analysis must be identified before such specimen or any analysis derived therefrom attains standing as evidence of the condition of the person whose conduct is questioned.

304

American Mutual Liability Insurance Company v Industrial Accident Commission, 78 Cal App2d 493, 178 P2d 40; State v Werling, 234 Iowa 1109, 13 NW2d 318; State v Romo, 66 Ariz 174, 185 P2d 757. Here, the person who had delivered the specimens to May for delivery to the laboratory testified at trial and identified the specimens and the defense joined in a stipulation of testimony from the person who had received the specimens from May. From the testimony of these witnesses, as well as others in the chain of custody, it may be established that the specimens were in May's possession less than 24 hours after he had received them. The various steps in the proper keeping and transfer of the specimens were fully shown. State v Van Tassel, 103 Iowa 6, 72 NW 497; State v Daly, 210 Mo 664, 109 SW 53; Cf. Nichols v McCoy, 235 P2d 412 (Cal App). In addition, there were no discrepancies either in the labelling of the specimens or in their identification at trial. McGowan v City of Los Angeles, 100 Cal App2d 386, 223 P2d 862. Furthermore, there are no suspicious circumstances present nor are any suggested indicating that the specimens had been tampered with prior to analysis. E.g., People v Riser, 305 P2d 18 (Cal); State v Smith, 222 SW 455 (Mo). Under all the facts presented, we are constrained to conclude that the Government has successfully bridged the gap created by the failure of May to testify.

We have carefully considered the accused's remaining assignment of errors and believe that they are lacking in merit. Accordingly, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.