UNITED STATES, Appellee,

v.

Kenny L. COURTS, Seaman, U. S. Coast
Guard, Appellant.

No. 35,109.

CGCM 9949.

U. S. Court of Military Appeals.

Sept. 29, 1980.

For Appellant: *Lieutenant Robert R. Meeks* (argued); *Lieutenant Michael L. Kudalis* (on brief); *Lieutenant Jon W. Peterson.*

For Appellee: *Lieutenant Commander Robert W. Ferguson* (argued); *Lieutenant Commander Thomas W. Snook* (on brief); *Lieutenant Commander Thomas W. Wheatley.*

*Opinion of the Court*

EVERETT, Chief Judge.

A general court-martial consisting of a military judge sitting alone convicted the appellant of possession of cocaine,[1] in violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892, and sentenced him to a bad-conduct discharge, confinement at hard labor for 3 months, and reduction to the lowest enlisted grade. The convening authority approved both the findings and the sentence, but pursuant to the recommendation of the military judge, he suspended the bad-conduct discharge for a period of 10 months. The punitive discharge has now been remitted. The United States Coast Guard Court of Military Review affirmed. *United States v. Courts,* 4 M.J. 518 (C.G.C.M.R.1977).

---

1. Additionally, he was acquitted of introduction of cocaine onto his Coast Guard ship, of transfer of cocaine, and of conspiracy to possess cocaine.

We granted review to consider appellant's claim that he was prejudiced by the admission at trial of evidence for which an adequate chain of custody had not been established. Also before us is his contention that the military judge should have granted the defense request for production of appellant's sister as a witness during the sentencing phase of his trial.

I

*Chain of Custody*

ET2 Mark J. Whipple,[2] testifying under a grant of immunity, was the central witness for the Government. He revealed that, while sailing to Peru on the Coast Guard Cutter GLACIER, he and appellant had several conversations about purchasing cocaine on the black market when the ship docked. Whipple had offered his services to Courts and other shipmates in making a purchase since he had "a pretty good idea" where to go. Whipple was "to get a percentage of what was bought in exchange for my going through the transaction." In buying cocaine, Whipple was to use money provided by several individuals—among them Courts. After their arrival in Peru, a purchase was made on or about March 20, 1976, from a "fellow known to me as Ed."[3] Whipple had met with Ed in the presence of appellant and others. Later on the same day Whipple and appellant went by taxi cab to Ed's house at Callao, Peru, where they purchased cocaine from him.

Only Courts and Whipple were present at that time. Courts bought cocaine with his own money, while Whipple used for this purpose money that had been supplied by several shipmates. Whipple paid Ed $2600 for some 260–280 grams of cocaine. Courts bought "approximately 50 grams" for "somewhere between $400 to $500." Whipple described the mechanics of the transaction in these terms:

I went back to the ship, got the money, while they brought the coke over. I looked at it, and sampled it, it seemed pretty good. So I left there, COURTS remained and I went back to the ship and got my money plus WILES gave me $1,000 and GIERMEK [4] gave me $1,000 because they could not come. Ed did not want a whole bunch of people with us. They asked me to pick theirs up and they gave me the money. I went back to the ship in the same taxi cab that took me, waited for me and took me back to the house. We counted out the money, gave it to Ed, and took possession of our cocaine.

According to Whipple, the cocaine delivered to them included that which he had bought for himself and his two shipmates and that which appellant had purchased. Since the drugs were in one of two packages of "fairly good size," he and Courts divided the contents between themselves before leaving Ed's house. The witness explained that:

[W]e opened these bags up and divided them up into a number of smaller quantities. Some of it was cut, some of it was uncut, packaged up in a number of different containers ranging anywhere from 10 grams of a cut substance all the way up to maybe 25–30 grams uncut.

The cocaine which Whipple possessed at this point and which Courts possessed had all "come from the same mixed delivery."

We just started weighing out the quantities. It came from the same one or two bags there, I am not really certain if it was one bag or two bags, but it all came from the same source.

Ed provided the cutting agent; Whipple thought "he said it was .05 percent boric acid in a powder form." All of the cocaine delivered by Ed was taken into their posses-

---

2. Whipple's conviction for offenses involving the cocaine obtained during the same transaction was set aside by the court below and the charges were dismissed. *United States v. Whipple*, 4 M.J. 773 (C.G.C.M.R.1978).

3. According to Whipple, "Ed" was not one of his own contacts but someone to whom Courts introduced him.

4. Giermek was called as a government witness at the trial but declined to testify on grounds of self incrimination.

sion by Whipple and appellant, none being left at Ed's house. "We took all of it with us. I took part of it first, and delivered it and came back and got the rest and then departed." Whipple and Courts went back to the ship by taxi cab and arrived about 8:30 p. m. Whipple had cocaine along his waist; it was "tucked underneath my belt and my shirt tucked over it."

Whipple assumed that Courts had cocaine on his person when he arrived at the ship, since "he wouldn't have left it at Ed's house, I don't think." However, Whipple didn't "honestly recall" seeing Courts physically in possession of cocaine after they had left Ed's. He did not think that Courts had gone on the GLACIER after they had arrived back at the dock. Indeed, Whipple had not seen Courts back aboard the ship until the last day that it was in port.

Recalled by the Government as a witness, Whipple testified that he had used cocaine many times. From the time when the GLACIER arrived in Peru until a later time when he turned in his own supply of cocaine, Whipple had inhaled drugs "constantly." [5] Inhalation was by means of a straw or a piece of paper rolled up "like a straw." He had seen Courts inhale cocaine "at Ed's house." Incident to uses of cocaine, Whipple had weighed cocaine on various occasions. At Ed's house he and Courts had "measured out roughly 10 grams increments" of cocaine by means of a scale with two balance pans and a set of metric weights. Asked how he knew this was cocaine, Whipple responded:

> I don't really know; I am not a chemist. It was something that was very similar in appearance and effect to what I had used earlier and had been told was cocaine. I was told that this was cocaine and I naturally assumed that it was cocaine.

Whipple then described cocaine as a white crystalline powder. Its physiological effect on him had been

> [a] numbing sensation, for . . . I guess it is related to novocaine and pro-

caine in that it is a pain killer. It has a numbing effect.

> .    .    .    .    .

> In the sinus and the throat, anywhere the saliva with the coke would trickle down becomes numb. You get a feeling of euphoria, you have a sensation that you are speeding like you were using an amphetamine or something. Your blood pressure goes down and your heart beats and you feel very anxious and somewhat nervous like you had drank a whole lot of coffee. Keyed up a little bit.

Later in the trial, before the Government called as a witness a forensic chemist named Buer, defense counsel objected that his testimony would be irrelevant because he would be describing the composition of substances whose source had not been established. The defense noted that, even if Mr. Buer had tested cocaine which came from Whipple and had been purchased at Ed's house, the substance which Courts bought might have been in an entirely different bag. Trial counsel conceded "that the testimony of WHIPPLE is not clear whether or not COURTS' cocaine was in fact from the same package that WHIPPLE's cocaine came from." However, he proposed to establish a chain of custody between the chemist and the initial delivery of cocaine to Whipple at Ed's house. In this way, trial counsel planned to give weight to Whipple's "lay testimony" about the substance which he had seen in appellant's possession. In the same connection, trial counsel referred to the Manual provision concerning corroboration of accomplice testimony. Para. 153a, Manual for Courts-Martial, United States, 1969 (Revised edition).

The military judge overruled the defense objection that Mr. Buer's testimony would be irrelevant. He determined to "admit it for the purpose not of establishing that any substance . . . possessed by the defendant was cocaine but *for the purpose of establishing that the witness WHIPPLE*

5. According to Whipple, he bought approximately an ounce more of cocaine a day or two after the purchase he made with Courts.

*had some experience and ability to tell co-
caine.*" (Emphasis supplied.)

In seeking to demonstrate that a chain of
custody existed, the Government recalled
Whipple once again. He testified that some
five days after its purchase at Ed's, he had
turned in his cocaine to the GLACIER's
Drug Exemption Officer, CWO Hampton.
As to its packaging at that time, he stated:

There were six plastic bags each contain-
ing approximately an ounce and a half.
These plastic bags were sealed with adhe-
sive tape. There was a seventh container
which was a wax paper like container,
just a large piece of wax paper folded up
similar to an envelope. That contained
probably a little less than an ounce, but it
was different from the other  .  .  .
it was bought from a different person
and at a different time, it was different
quality.

The six plastic bags had come from Ed's,
but the paper container had not. It had
been purchased from an unidentified Peru-
vian national. Whipple had sampled all
seven packages; the physiological effects
had been "euphoria, numbness, speeding
like I had been taking amphetamines, that's
about it."

CWO Hampton testified that, in connec-
tion with his collateral duties as drug ex-
emption officer aboard the GLACIER, he
had counseled Whipple. Then Whipple had
turned in to him approximately three quar-
ters of a pound of suspected cocaine. "La-
ter on it was weighed by Federal officers
and tested."

When delivered to Hampton around
March 25, the substance

was packaged in a clear plastic bag.
There were six bags of similar packaging
sealed with an adhesive tape and then
there was one package, the seventh pack-
age was of wax paper type packaging
was not sealed and they were all in a
white opaque bag with the department
store in Valpariso lettering on it, similar
to Montgomery Ward. Ontaro Depart-
ment Store I think it was. The small
white·opaque plastic shopping type bag.

Hampton had placed the material·in his
safe "without examining it at that time."
Upon the return to the ship two days later
of its executive officer, Commander Coste,
Hampton turned the material over to him
in the wardroom. The last time he had
seen the substance before it left the vessel
"was when it was withdrawn from the nar-
cotics safe in sickbay and tested by federal
officers."

Lieutenant Commander Harry D. Hamil-
ton, Chief of the Intelligence and Law En-
forcement Branch for the Eleventh Coast
Guard District, identified prosecution exhib-
it 9, a custody receipt card for items pur-
portedly received from Commander Coste
at Long Beach, California, on April 9th.
The document referred to one "plastic bag
containing six baggies of white powder and
one paper packet of white powder." On its
reverse side was a Coast Guard Intelligence
chain of custody receipt. This indicated
that on April 9th Hamilton released this
same property to Special Agent Clifford
Loveless of the Drug Enforcement Admin-
istration (DEA), the purpose being "DEA
Lab." Hamilton testified that he had re-
ceived and delivered the material as shown
on this exhibit.

Next, Mr. Buer was called and stated
that, as a forensic chemist for the Drug
Enforcement Administration, he had tested
specimens for cocaine "at least 300 times."
Through him, the Government offered in
evidence prosecution exhibit 10, a complet-
ed DEA Form entitled "Report of Drug
Property Collected, Purchased, or Seized."
The name of the subject of the report was
Mark J. Whipple; the alleged drug was
cocaine in an approximate gross quantity of
ten ounces; the marks or labels were de-
scribed as "Plastic bags containing a strip
of white surgical tape and the initials CEL
and date of 4/5/76."[6] According to the
report, the original container was not being
submitted separate from the drug.

Other entries on the form show that on
April 12 Evidence Custodian Simpson re-
ceived from Loveless one package with an

**6.** The initials of DEA Special Agent Loveless
are "CEL."

unbroken seal. At the bottom of the form is a Laboratory Analysis Comparison Report, which purports to give the results of an analysis conducted by Mr. Buer on April 16. Defense counsel interposed a "continuing objection" for "relevance" as to exhibit 10 but stated that he had no other objections. The exhibit was received in evidence.

According to Buer, after he had "received a sealed Drug Enforcement Administration locked sealed evidence envelope," he

> broke the seal on it and removed the contents. I found them to be seven small plastic bags containing . . . or eight clear plastic bags containing a white powder. A wax paper packet containing a white powder and small plastic vial containing a white powder. Upon visual examination of the eight plastic bags I found that one had a different appearance and texture from the rest. I segregated that one and gave it . . . what I did then was breakdown the exhibit as I received it. Seven of the bags of white powder I labelled as Exhibit A, the separate bag I labelled as Exhibit B, the wax paper packet I labelled Exhibit C and the vial as Exhibit D. I treated each one of those as a separate exhibit.

Each bag had been tested separately with a chemical reagent. Because Buer's tests indicated that seven of the bags were of the same composition and strength, they had been grouped by him as exhibit A. The other, which was of "a different appearance and texture," was analyzed separately as exhibit B. According to the tests all the exhibits contained cocaine. After performing the tests, Buer "sealed the material back in the original clear plastic bag."

After this evidence, the Government rested, whereupon the defense moved unsuccessfully for findings of not guilty to all the charges and specifications. Then the defense rested.

We shall treat trial defense counsel's "continuing objection" to the "relevance" of prosecution exhibit 10 and of Buer's testimony as having two aspects: (a) an assertion that the cocaine tested was not relevant even if it was the same which Whipple testified he had purchased at Ed's house; and (b) a claim that there was no chain of custody to establish that this was the same substance that Whipple had purchased while he was with appellant.

As to the former contention, the military judge ruled, when the defense counsel first objected, that Whipple's connection with the cocaine tested by Buer was relevant because it helped establish that Whipple could recognize cocaine. However, a person might be able to identify a substance as cocaine on one occasion in a particular setting and yet misidentify some other substance as cocaine at another time and place. Thus, the relevance of this evidence was minimal under the theory on which it was initially admitted by the military judge. Moreover, if the trial had been before court members, rather than a military judge, we would be concerned that the triers of fact might be confused about the significance of this evidence.

From the record we cannot discern whether at a later time in the trial the military judge concluded that the chemist's testimony and laboratory analysis also were relevant and would be considered for another purpose. If so, we concur in that conclusion, since we would deem it quite relevant that a substance which is later identified by a chemist as cocaine came into Whipple's possession as part of a transaction in which Courts allegedly bought cocaine from the same seller at the same time and place. Furthermore, Whipple's testimony as to how he and Courts had cut the cocaine at Ed's house tends to show that if cocaine was possessed then by Whipple, it also was possessed by Courts.

Accordingly, even if the military judge did not seek to limit the receipt of evidence about the laboratory analysis to the purpose for which he initially ruled it admissible—namely, to demonstrate Whipple's ability to identify cocaine—appellant has no cause for complaint. Conversely, Courts was not harmed if the military judge considered this prosecution evidence on only one of the matters to which it was relevant.

■ The laboratory analysis was neither relevant nor admissible if it did not concern the same substance that Whipple delivered to CWO Hampton.[7] Thus, we must determine if the Government established a chain of custody on which to predicate admission of the laboratory analysis into evidence. Of course, trial of this case preceded our decision in *United States v. Nault*, 4 M.J. 318 (C.M.A. 1978). However, even if *Nault* applies fully here,[8] we conclude that a chain of custody was established.

As *Nault* explains,

Generally fungible evidence becomes admissible and material through a showing of continuous custody which preserves the evidence in an unaltered state. *United States v. Jones* 404 F.Supp. 529, 542 (D.C.E.D.Pa. 1975); *United States v. Bass*, 8 U.S.C.M.A. 299, 24 C.M.R. 109 (1957). This may be shown by having the testimony of the handlers of the fungible goods produced in court.

4 M.J. at 319–20. We acknowledged in *Nault*, however, that it is not always necessary to call as a witness everyone who handled evidence in the chain of custody. Thus, in *United States v. Bass, supra*, evidence had been admitted even though one custodian in the chain did not testify at trial.

In *Nault* our references to "fungible goods" concerned a single small pill which was pink or purple in color. However, in the case at hand, we conclude that cocaine had been identified by its packaging and otherwise to such an extent that it was no longer "fungible" within the meaning of *Nault*.

Whipple delivered to CWO Hampton a "small white opaque plastic shopping type bag" containing six small plastic bags packaged in the same way and another packet wrapped in wax paper. Hampton testified that, after keeping these items in a safe for two days, he had delivered them on March 27th to Commander Coste, the ship's executive officer. In turn, Lieutenant Commander Hamilton described how on April 9th, he had obtained from Coste one plastic bag containing six "baggies" of white powder and a paper packet of white powder. On that same day he had turned all these objects over to Special Agent Loveless of the Drug Enforcement Administration to take to that agency's laboratory. Hampton's testimony corresponded with prosecution exhibit 9, the receipt, to which the defense had no objection.

Of course, CWO Hampton testified that the last time he had seen the package which Whipple had delivered to him "was when it was withdrawn from the narcotics safe in sickbay and tested by federal officers." However, it is not clear whether the "testing" to which he referred was performed at the DEA laboratory by Mr. Buer or instead was performed aboard the vessel. In either event, we do not equate it to the "tampering" mentioned in *Nault*.

Although Loveless was not called as a witness, his absence from the trial did not preclude proof of a chain of custody. The laboratory analysis by Mr. Buer, who did testify, was recorded on an official Drug Enforcement Administration form, which stated that the analysis had been completed on April 16, 1976, only a week after Loveless received the evidence. The gross weight of some 347 grams, which is recited in the lab analysis, is slightly more than twelve ounces[9]—*i.e.*, three quarters of a pound. Hampton testified that Whipple had turned over to him about three quarters of a pound of suspected cocaine.

According to the testimony of both men, Whipple had delivered to Hampton a plastic bag containing not only six smaller plastic bags but also a packet wrapped in waxlike paper. Buer received and tested a wax

---

7. If the military judge only used this evidence to help establish Whipple's ability to recognize cocaine, reception of the evidence did not prejudice appellant; Whipple's familiarity with cocaine was amply established by other evidence.

8. An issue as to the retroactivity of *United States v. Nault*, 4 M.J. 318 (C.M.A. 1978), is now pending before this Court. *United States v. Lewis*, 8 M.J. 241 (C.M.A. 1980).

9. One ounce is 28.3495 grams.

paper product. Moreover, when he completed his tests, Buer "sealed the material back in the original clear plastic bag"—a container which corresponds generally with the bag in which Whipple delivered the smaller package to Hampton. Admittedly, the DEA—sealed evidence envelope which Buer received contained a number of small plastic bags greater than that which Whipple had delivered to CWO Hampton, or which Hamilton had delivered to Loveless. This discrepancy does not suffice to establish "tampering";[10] indeed, its importance is minimal since Buer tested each small plastic bag and each contained cocaine.

On the top portion of the DEA Form which contains Buer's laboratory analysis are various entries which purport to link Whipple to the items being submitted by Special Agent Loveless for laboratory analysis. Whether or not those entries are admissible as exceptions to the hearsay prohibition,[11] Agent Loveless' signature at two places on the same DEA Form is admissible to help establish that Buer made his laboratory analysis of the same items which Loveless had received from Lieutenant Commander Hamilton.

When an object is offered in evidence which bears initials purporting to be those of a person who at one time had possession of a similar object, the presence of the initials may help establish a chain of custody even though the person who affixed those initials is not called as a witness. Similarly, when small plastic bags containing a substance intended for laboratory analysis are accompanied by a document which bears the signature of a person who previously was in possession of similar bags, the presence of the signed document tends to show that the substance to be analyzed had been in the hands of the signatory. This inference is stronger here, since at one place on the form Loveless' signature is accompanied by a date of April 9, 1976—the very day he received from Hamilton small plastic bags to be taken to the DEA laboratory.

Like the "manicured" marihuana involved in *United States v. Fowler*, 9 M.J. 149 (C.M.A. 1980), the packages of cocaine in the case at bar were not "fungible goods" within the contemplation of *Nault*. Although the prosecution did not exclude every possibility of tampering, it was not required to do so. *Gass v. United States*, 416 F.2d 767, 770 (D.C.Cir. 1969); *United States v. Jones*, 404 F.Supp. 529, 542–43 (E.D.Pa. 1975), *affd.* 538 F.2d 321 (3d Cir. 1976). Instead, "[t]he Court need only be satisfied that in reasonable probability the article had not been changed in important respects." *West v. United States*, 359 F.2d 50, 55 (8th Cir. 1966), *cert. denied*, 385 U.S. 867, 87 S.Ct. 131, 17 L.Ed.2d 94 (1966); *see United States v. Lane*, 591 F.2d 961, 962 (D.C.Cir. 1979); *United States v. Brown*, 482 F.2d 1226, 1228 (8th Cir. 1973).

When we consider all the evidence, including the absence of "a minimal showing of ill will, bad faith, other evil motiva-

---

10. It bears repeating what the Court recently said in *United States v. Strangstalien*, 7 M.J. 225, 229 (C.M.A. 1979) (footnote omitted):

    [A]lso we presume the regularity of procedure in the handling and storage of the specimens to insure absolute identity between the items received, then analyzed, and this subsequent representation in the written report. This is, furthermore, in accord with the well-established rule of law that without a contrary showing, the presumption of regularity supports the official acts of public officials. . . . [W]e presume regularity in the chemical laboratory business handling of the specimen absent contrary showing.

    *See United States v. Lane*, 591 F.2d 961, 962 (D.C.Cir. 1979); *Gallego v. United States*, 276 F.2d 914, 917 n.2 (9th Cir. 1960).

11. The opinions in *United States v. Nault, supra*, discuss this issue. Here the chain of custody receipt appears on the same form which contains the laboratory analysis. Moreover, DEA performs other functions besides criminal prosecution. However, Buer, the forensic chemist, gave no testimony about the DEA procedures for preparing such forms. For a recent case involving the admissibility of DEA forms containing a chemical analysis and a summary of information relating to the purchase of the narcotics analyzed, *see United States v. Coleman*, —— F.2d —— (D.C.Cir., July 11, 1980).

tion or some physical evidence of tampering," *United States v. Daughtry*, 502 F.2d 1019, 1021 (5th Cir. 1974), we conclude that the military judge had before him credible evidence sufficient to link the cocaine tested by Buer with the material that Whipple purchased at Ed's house in Callao, Peru, and later delivered to CWO Hampton—and which Whipple testified was cocaine. Therefore, the judge did not err in admitting prosecution exhibit 10, which contained the laboratory analysis, along with the testimony of Buer who had performed that analysis.

## II

*Defense Witness on Sentencing*

Shortly before trial was to begin on the first day (it lasted two days), defense counsel submitted to trial counsel a request that the appellant's sister be brought to court at government expense to testify as a material witness on sentencing. Ultimately, the judge denied the request and the parties entered into a stipulation of expected testimony. The appellant now complains of the denial of live sentencing testimony from his sister.

After disputing that a military accused had a constitutional [12] or statutory [13] right to a live witness in the sentencing stage of the trial (*contra, United States v. Willis*, 3 M.J. 94, 95 n.1 (C.M.A. 1977); *United States v. Manos*, 17 U.S.C.M.A. 10, 14, 37 C.M.R. 274, 278 (1967)), the Government finally acknowledges in its brief that paragraph 75 of the Manual for Courts-Martial, United States, 1969 (Revised edition), does encompass the personal appearance of such witnesses. Still, the Government denies that even this Manual provision authorizes compulsory process for such witnesses. In oral

argument before this Court the Government retreated even further and conceded that compulsory process for sentencing witnesses is sometimes available—although not in every instance.

▪ In *United States v. Scott*, 5 M.J. 431 (C.M.A. 1978), this Court announced the law to be established that an accused has the right "to have the testimony of a witness at either a trial on the merits or in a hearing in extenuation and mitigation." (Footnote omitted.) Of course, the right extends only to witnesses whose testimony is material. *United States v. Willis, supra*; *United States v. Carpenter*, 1 M.J. 384 (C.M.A. 1976). Indeed, we believe that materiality to the issue before the court-martial [14] is the standard whether the witness is to testify on the merits or on sentencing.

The real issue in *Scott*, however, was the same as in this case: If the testimony [15] of a witness is material and so must be produced, in what *form* must it be produced? We answered: "Although live testimony of such a witness normally is imperative to the fairness of the process, occasionally some alternate form of testimony will pass muster under the facts and circumstances of a given case." *Id.* at 432. And we concluded that it was the responsibility of the trial judge to determine in his discretion, upon proper motion, whether "some judicially accepted alternate form of testimony" was permissible in lieu of live testimony, being "scrupulous in assuring that the effect of the form of the testimony under the particular facts and circumstances of the case will not diminish the fairness of the proceedings." *Id.*

▪ In view of the substance of the expected testimony of appellant's sister, the

---

12. U.S.Const. Amend. VI.

13. Article 46, Uniform Code of Military Justice, 10 U.S.C. § 846.

14. "Material evidence" has been defined as "[e]vidence which has an effective influence or bearing on [the] question in issue." *Black's Law Dictionary*, 881 (Fifth edition 1979). On the merits, the question in issue, naturally, is guilt or innocence, while on sentencing it is

what sentence if any is "legal, appropriate, and adequate." *See* para. 76a (1), Manual for Courts-Martial, United States 1969 (Revised edition).

15. The Court there defined "testimony" as "verbal evidence, subject to the criteria of credibility, and tested by the same rules and manner as any other evidence." *United States v. Scott*, 5 M.J. 431, 432 (C.M.A. 1978).

practical difficulties of producing it live, other live testimony on the same topic available to appellant, and the timing of the defense request,[16] it is our judgment that the judge did not abuse his discretion in refusing to compel the Government to bring the witness to testify at the trial.

### III

The decision of the United States Coast Guard Court of Military Review is affirmed.

COOK, J., concurs.

FLETCHER, Judge (dissenting):

It is important to remember that the appellant was not found to have any white crystalline powder on his person or in any of his possessions. The evidence of possession of cocaine by the appellant consists solely of the testimony of his alleged accomplice, Whipple, and a laboratory analysis of the white crystalline powder purportedly surrendered by Whipple to military authorities. The question before this Court is twofold: First, was the chain of custody as to Whipple's white crystalline powder sufficient as a foundation for the admission of this chemist's laboratory analysis? Second, if the foundation was sufficient, was it material to prove possession of cocaine by this appllant? I find it necessary to write only as to the first facet of the question, in that I do not believe that there was a sufficient foundation laid for introduction of this chemical analysis evidence. I do not reach the question of its materiality.

The general rule is set forth in *McCormick et al. on Evidence* (2nd Ed. HB 1972), Sec. 212, pp. 527–28 (footnotes omitted):

It will be readily apparent that when real evidence is offered an adequate foundation for admission will require testimony first that the object offered is *the* object which was involved in the incident, and further that the condition of the object is substantially unchanged. If the offered item possesses characteristics which a.·e fairly unique and readily identifiable, and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit merely on the basis of testimony that the item is the one in question and is in a substantially unchanged condition. On the other hand, if the offered evidence is of such a nature as not to be readily identifiable, or to be susceptible to alternation by tampering or contamination, sound exercise of the trial court's discretion may require a substantially more elaborate foundation. A foundation of the latter sort will commonly entail testimonially tracing the "chain of custody" of the item with sufficient completeness to render it improbable that the original item has either been exchanged with another or been contaminated or tampered with.

It should be further noted that neither the Whipple white crystalline powder nor any of the various containers in which it found itself was introduced into evidence. The evidence offered by the Government was an incomplete custody sheet, a DEA form entitled "Report of Drug Property Collected, Purchased, or Seized," and the testimony of a chemist Buer. The DEA form contained certain entries which included the hearsay information that the individual containers which held Whipple's white crystalline power had a piece of white surgical tape with the initials CEL on it. Neither the packages nor the testimony of anyone with initials close to CEL was produced at trial.

I would observe that three of the persons who handled Whipple's white crystalline powder did not testify. It is interesting that no comprehensive custody sheet was introduced showing the handling by these three persons or what disposition they made of the material.

16. The situs of the trial was Long Beach, California, and the home of the witness was Indianapolis, Indiana. Even though the trial defense counsel had represented the appellant from the beginning, through an Article 32 investigation, she waited until the morning of the trial to raise this matter with her counterpart for the Government.

In this brief summary, one other observation is essential in regard to the general rule stated above. The white crystalline powder taken from Whipple was contained in six small sealed plastic bags and one unsealed wax paper packet. The white crystalline powder that the chemist Buer tested was in seven or eight plastic bags, one wax paper packet and one small plastic vial. It is obvious that between Whipple and the chemist, either some one of the five persons in this chain of custody (only two of whom testified) changed its composition, or the substance tested by the chemist was not the same white crystalline powder taken from Whipple. There is no testimony by any witness that he changed the make up of the white crystalline powder taken from Whipple.

With these facts in mind, I am forced to dissent. I set forth below the law as I perceive it in relation to the facts enumerated above.

### Identity of the Tested Substances Fungibility

I disagree with the majority opinion in its unjustified relaxation in this case of the stringent tracing requirements necessary to establish the foundation for the admission of fungible real evidence at a military trial. See United States v. Nault, 4 M.J. 318, 320 (C.M.A.1978). It does so on the basis of its conclusion that the cocaine in this case had been identified by its packaging and otherwise to the extent that it was no longer "fungible" within the meaning of Nault. See United States v. Fowler, 9 M.J. 149, 152 (C.M.A.1980). Accordingly, the majority implies that a strict chain of custody for identity purposes need not be established in this case to connect the tested substances to Whipple's white crystalline powder. In this way, the majority permits three separate gaps or missing links in this chain of custody to go completely unexplained or accounted for in less than a satisfactory manner.

The basis of the majority's conclusion that the cocaine in this case is not "fungible" is that there are special facts in this case which render it readily identifiable. See United States v. Fowler, supra; United States v. Bass, 8 U.S.C.M.A. 299, 24 C.M.R. 109 (1957). The special facts particularly mentioned in the opinion are that the cocaine was packaged in a particular way. The majority notes that Whipple's white crystalline powder was in six small sealed plastic bags and one unsealed wax paper packet; all these materials were further contained in a small white opaque shopping bag which was unsealed. Such factual observations are supported by the in-court testimony of Whipple, Hampton and Hamilton. In addition the majority observed that, with insufficient discrepancies, the chemist Buer testified that the cocaine he tested was in seven or eight small plastic bags, one wax paper packet, and one small plastic vial all likewise contained in a clear plastic bag generally corresponding to the Whipple shopping bag. From this comparison of testimony in the record of trial, the majority concludes that, like the manicured marihuana in United States v. Fowler, supra, these packages of cocaine were not "fungible goods" within the contemplation of Nault and were readily identifiable as Whipple's white crystalline powder.

I do not believe this is a fair statement based on the facts of this case or those stated in United States v. Fowler, supra.

First, Whipple, Hampton, Coste, Hamilton and Loveless, previous links in the chain of custody, did not at trial identify the substances tested by Buer as Whipple's white crystalline powder which they had once handled. This was done in United States v. Fowler, supra, by several witnesses who preceded the gap in the chain of custody in that case.

Second, cocaine as a white powder substance must generally be considered fungible in the sense that it does not possess individual physical characteristics which on sight would permit distinguishing one amount of cocaine from another. In Fowler, the marijuana, another generally fungible substance, was shown to be manicured, that is, cut in an unusual way which the witnesses at trial recognized. Here, only the chemist Buer and Whipple testified that

the tested cocaine and Whipple's white crystalline powder had any readily identifiable qualities or characteristics. Buer testified that the cocaine in *one of his small plastic bags* had a color different from the rest. Whipple, however, had previously testified that the substance *in his wax paper packet* was different in quality from the rest. I do not believe this evidence is sufficient to show that either of these substances was capable of ready identification as was the manicured marihuana in *Fowler*.

*Third*, neither Whipple, Hampton, Coste, Hamilton or Loveless identified in court the containers of the substances tested by Buer as the original containers of Whipple's white crystalline powder they once handled. This was done in both *United States v. Fowler, supra*, and *United States v. Bass, supra* at 304, 24 C.M.R. at 114.

*Fourth*, while the original containers of Whipple's white crystalline powder might be considered readily identifiable under certain circumstances, such an evidentiary inference does not lie in the present case. In both *Fowler* and *Bass*, the records of trial clearly indicated that there were *no discrepancies* in the identification or labeling of the substances. Here *several discrepancies which were unexplained* are apparent on the record; these concern the physical appearance of the packaging. First, two extra small plastic bags of a white powder substance were found in the evidence envelope tested by the chemist Buer. Second, there was also found one extra small plastic vial. Neither of these additions was identified or even mentioned by previous links in the chain of custody. The chemist Buer also offered no explanation for their presence. Third, the chemist Buer offered no clear testimony that the small plastic bags were sealed with adhesive tape as testified by Whipple and Hampton. In light of these unexplained discrepancies, *Fowler* is no authority for concluding the packaging of the cocaine in this case created an evidentiary inference that the substances tested by Buer were readily identifiable as Whipple's white crystalline powder.

In light of these factors, the Government has not established that the alleged cocaine in this case was not fungible within the meaning of *United States v. Nault, supra*, because of its distinctive packaging and otherwise. I believe that for the Government to establish the identity of the substances tested by Buer, it was necessary to show a continuous chain of custody of Whipple's white crystalline powder to the chemist Buer.

### Chain of Custody

Perhaps sensing the unpersuasiveness of its fungibility holding or in hopes of showing Whipple's white crystalline powder was in an unchanged condition when tested by Buer, the majority also concludes that a continuous chain of custody was established in this case. This conclusion is reached despite the fact that three separate links in the chain of custody did not testify in court as to their handling of Whipple's white crystalline powder. Two of these missing links, Commander Coste and evidence custodian Simpson, are not discussed at all with respect to the evidentiary impact of their absence as witnesses at this court-martial. Such unexplained omissions do not generally suffice to provide a proper showing of a continuous chain of custody. *See generally United States v. Nault, supra*. In any event, I will proceed to discuss the third gap in this chain of custody.

The missing link in the chain of custody which is discussed by the majority opinion is the handling of Whipple's white crystalline powder by Special Agent Loveless, an investigator for the Drug Enforcement Administration. Though noting that Loveless did not testify at trial, the majority states that this gap was bridged by certain signatures of Agent Loveless on prosecution exhibit 10 which accompanied the substances the chemist Buer tested. The majority reasons that these signatures on the DEA Form accompanying the substances tested by Buer provide an evidentiary inference that the signatory Loveless had these materials in his possession. It notes that the date following these signatures may pro-

vide evidence on when he had them in his possession. Finally, it concludes that since Hamilton testified that on this same date he turned Whipple's white crystalline powder over to Loveless, it may be inferred that the chemist Buer tested the same substances that Agent Loveless received from Commander Hamilton, i. e., Whipple's white crystalline powder. I must disagree.

First, the conclusion of the majority's inferential theory is contradicted by other evidence in this case. The chemist Buer testified that this DEA form with Loveless' signatures accompanied the following items: seven or eight small clear plastic bags, one wax paper packet and one small plastic vial. Under the majority's reasoning these materials all can be inferred to have been in the possession of the signatory Loveless. Continuing with the majority's rationale, from the date following these signatures, it can be inferred that all these materials were in Loveless' possession on April 9, 1976. Finally, consistent with the majority theory, it also must be inferred that all of these materials were given to Loveless by Hamilton on that date. However, other evidence in this case including prosecution exhibit 9 clearly indicate that Whipple's white crystalline powder provided by Hamilton to Loveless only included six small plastic bags and one wax paper envelope. Accordingly, the majority's inferential theory is fatally flawed.

Second, a key inference of the majority's theory is based on obvious hearsay evidence which has not qualified under any exception to this rule. Para. 139, Manual for Courts-Martial, United States 1969 (Revised edition). The majority opines that the date following the signature may be used to show not only that Loveless, the signatory, possessed the accompanying substances at some time but also when that time was. This is a situation where the signed date is offered to prove the truth of its statement that Loveless possessed the tested substances on April 9, 1976, and not simply

provide an evidentiary inference from the handwriting that the signatory did possess it at some time. The majority opinion already has noted, in footnote 11, that similarly used entries on this same part of the DEA form are hearsay evidence and the chemist Buer gave no testimony about DEA procedures for preparing such forms.[1] Accordingly, I do not believe these signed dates can be used for this purpose and the majority's theory again falters.

Finally, the substances tested by the chemist Buer have not been sufficiently traced to Whipple by the establishment of a continuous or otherwise sufficient chain of custody. Cf. United States v. Bass, supra. Ignoring the gap created by Commander Coste's absence from trial, the majority opinion traces Whipple's white crystalline powder to Agent Loveless so far as April 9, 1976. There is no competent evidence in this record as to what Loveless did with these particular materials thereafter. Ignoring the gap in evidence created by custodian Simpson's absence, the majority opinion traces the substances the chemist Buer tested to Agent Loveless at some unspecified time before April 16, 1976. There is no competent evidence in this record of trial where Loveless gained possession of these materials. In light of the fungible nature of all these substances, the potential time differential in their possession by Loveless, the obvious discrepancies in their packaging and otherwise, and the absence of Loveless as a witness in court, I am unable to conclude that the Government has properly identified the substances so as to permit the relevant admission of the challenged evidence at appellant's court-martial. See United States v. Nault, supra. Moreover, I do not believe that any presumption of regularity which might be attributed to Agent Loveless' handling of both these substances is sufficient for this Court to conclude that "the Buer substances" and Whipple's white crystalline powder were one and the same.

1. This court has not adopted the position of the District of Columbia Circuit in United States v. Coleman (D.C.Cir. July 11, 1980), that such entries by police officers are not reports prepared for purposes of prosecution. See United States v. Nault, 4 M.J. 318, 320 n. 7 (C.M.A.1978).

## Unchanged Condition

Even assuming the correct identity of the substances tested by Buer is established, the second foundational requirement for the admission of the laboratory analysis and the chemist's testimony is that it be shown by the Government that Whipple's white crystalline powder was substantially unchanged when Buer performed his tests upon them. *See McCormick et al. on Evidence, supra; see also* Comment, *Preconditions for Admission of Demonstrative Evidence*, 61 Nw.L. Rev. 472, 481–88 (1966). The majority, citing leading federal cases, notes that "the prosecution [need] not exclude every possibility of tampering" but must only satisfy the court "that in reasonable probability" Whipple's white crystalline powder "had not been changed in important respects." 9 M.J. at 149. *See generally United States v. Daughtry*, 502 F.2d 1019, 1021 n. 3 (5th Cir. 1974). In accomplishing this purpose, the majority opinion relies heavily on its conclusion that a presumption of regularity may be attached to Agent Loveless' handling of Whipple's white cyrstalline powder. It asserts that in light of this presumption of regularity, the evidence of discrepancies in the condition of Whipple's white crystalline powder must be considered insufficient to establish tampering. Finally, as an alternative, it finds these discrepancies minimal. The end result is that Whipple's white crystalline powder was found by the majority to have been tested by the chemist Buer in a substantially unchanged condition from when it was delivered by Whipple.

My review of the record of trial in this case reveals some evidence that Whipple's white crystalline powder was tampered with prior to its purported testing by the chemist Buer. Moreover, I do not find the presumption of regularity applicable to Agent Loveless' custody of Whipple's white crystalline powder. Since the Government did not call the missing links in this chain of custody to account for the handling of Whipple's white crystalline powder during these periods or otherwise explain the discrepancies in the present case, I am not convinced that no reasonable possibility existed that Whipple's white crystalline pow-

der was changed prior to its purported testing by the chemist Buer.

I must note at the beginning that this is not a case where the defense merely speculates as to the possibility or opportunity for tampering because one witness in the chain of custody did not testify in court. *See United States v. Anguloa*, 598 F.2d 1182, 1186–87 (9th Cir. 1979); *West v. United States*, 359 F.2d 50, 55 (8th Cir. 1966), *cert. denied*, 385 U.S. 867, 87 S.Ct. 131, 17 L.Ed.2d 94 (1966). There is evidence of actual tampering in this record of trial.

*First*, the testimony of Whipple indicates that his six small plastic bags contained approximately nine ounces of cocaine (six bags of one and one half ounces) and one ounce in the wax paper packet; *ten ounces* in all. Hampton testified that he received approximately three-quarters of one pound (*twelve ounces*) of Whipple's white crystalline powder. Prosecution exhibit 10 indicates that Agent Loveless marked the DEA form accompanying the substance tested by Buer as having a weight of *ten ounces*. The chemist Buer stated that the substances he tested weighed approximately *twelve ounces*. Standing alone and explained, these weight discrepancies might be considered meaningless. *See United States v. Walton*, 602 F.2d 1176, 1178–79 (4th Cir. 1979); *United States v. Barnes*, 586 F.2d 1052, 1056 (5th Cir. 1978); *United States v. Godoy*, 528 F.2d 281, 283 (9th Cir. 1975); *United States v. Daughtry, supra*. In appellant's case, however, these discrepancies in weight do not stand alone nor are they explained by the Government.

*Second*, the testimony of Whipple, Hampton and Hamilton confirm that up to this point in the chain of custody there were six small plastic bags and one wax paper packet containing Whipple's white crystalline powder. The testimony of the chemist Buer, three steps down the chain of custody, indicates there were seven or eight small plastic bags, one wax paper packet and one small plastic vial. These discrepancies are not explained in any way by the Government.

*Third,* the ambiguous testimony of Hampton noted by the majority indicates that a field test may have been held by federal officers in the sick bay of appellant's ship. No other evidence was offered by the Government to explain this testimony of Hampton or account for the condition of Whipple's white crystalline powder during such a field test.

Under these circumstances, this record of trial cannot be considered "bare of any indication" that the evidence was mishandled. *See Gass v. United States,* 416 F.2d 767, 770 (D.C. Cir. 1969). The Whipple white crystalline powder was in six sealed small plastic bags and an unsealed wax paper packet, all further enclosed in an unsealed plastic shopping bag at least until Loveless received them. In light of the testimony of the chemist Buer, there is a clear indication that after that time the large shopping bag was opened. Moreover, there is a clear indication in the record that some amount of small, sealed, clear plastic bags was added to this bag and they cannot be distinguished from the bags allegedly containing Whipple's white crystalline powder. There also is a clear indication that one plastic vial was added to the larger plastic shopping bag. Tampering of some type occurred in this case.

The majority, however, asserts that this evidence does not suffice to establish tampering because a presumption of regularity in the handling and storage of the substances attached during Agent Loveless' possession of Whipple's alleged white crystalline powder. *See United States v. Strangstalien,* 7 M.J. 225, 229 (C.M.A.1979). I do not believe this presumption of regularity attached in this case for the following reasons:

*First,* Agent Loveless was not a neutral chemist but an investigative agent for the Drug Enforcement Administration. In this status, he was much like the prosecutorial custodian of real evidence spoken to in footnote 8 of *United States v. Nault, supra.* No presumption of regularity was found for such a person's possession of criminal evidence in view of paragraph 144*d*, Manual,

*supra. See United States v. Porter,* 7 M.J. 32 (C.M.A.1979); *United States v. Neutze,* 7 M.J. 30 (C.M.A.1979). *See also Gass v. United States, supra. Cf. United States v. Coleman* (D.C.Cir. July 11, 1980); *United States v. Nelson,* 603 F.2d 42, 47 (8th Cir. 1979).

*Second,* if Agent Loveless was not acting in an investigative or criminal prosecution capacity, it was up to the Government to demonstrate this fact. They did not show what procedures were regularly employed by the laboratory to get materials for chemical testing and whether Agent Loveless was a part of this receiver procedure of the lab. *See* 9 M.J. at 291 n. 11. Since no testimony whatsoever was offered on these questions, the Government is not entitled to take advantage of the *Strangstalien* presumption of regularity for Loveless' period of custody of Whipple's white crystalline powder.

*Third,* even assuming the presumption of regularity might be applicable to Agent Loveless as a member of the DEA crime laboratory, the contrary showing of irregularity of treatment by other evidence in this case precludes the operation of the presumption. The possible field test by agents on the ship was not shown to be a part of normal procedure of the lab. Also, the unexplained addition of indistinguishable small plastic bags of white powder and one plastic vial of white powder to Whipple's alleged white crystalline powder could simply not be normal procedure, nor has the Government shown it is part of their regular specimen custody procedures.

No presumption of regularity is applicable in the present case for Agent Loveless.

The majority opinion finally asserts that the importance of the discrepancies in this case are minimal because the chemist Buer tested each small plastic bag and each contained cocaine. (The plastic vial and the wax packet were also tested and found to contain cocaine.) This conclusion is based on the supposition that the unaccounted for containers were simply added to the original containers. It is possible, *without testimony on this issue,* that an entirely new

collection of six small plastic bags was added to the opaque shopping bag along with the extra bags and the plastic vial. We cannot know unless the original small plastic bags were identified (which they were not), or the substance itself was marked or possessed individual characteristics (which it was not) or Loveless testified as to what happened during his period of custody (which he did not). I do not believe the majority's rationale on this part is persuasive in the least. *Cf. United States v. Daughtry, supra.*

In conclusion, under the facts and circumstances of this case, I cannot agree that the Government has sufficiently shown that Whipple's white crystalline powder if tested by Buer was in a substantially unchanged condition. The *nature of the cocaine* in this case is fungible because it was a white powder substance and because it was packaged in indistinguishable sealed small clear plastic bags. The *circumstances of its preservation and custody* are highly suspect since the large shopping bag containing these bags was not sealed until someone with the initials CEL placed it in a sealed evidence envelope. *The probability of intermeddling or tampering* is great since at the very least it is clear that two plastic bags and one plastic vial were added to Whipple's alleged white crystalline powder. *See United States v. Brown,* 482 F.2d 1226, 1228 (8th Cir. 1973). Prosecution exhibit 10 and the testimony of the chemist Buer also should not have been admitted on this ground.

I would reverse the decision of the court below and set aside the findings of guilty and the sentence.