UNITED STATES, Appellee,

v.

Gerard P. TROTTIER, Airman, U.S. Air Force, Appellant.

No. 35,854.

ACMS 24552.

U. S. Court of Military Appeals.

Oct. 14, 1980.

For Appellant: *Major Gary C. Smallridge* (argued); *Captain Douglas H. Kohrt* (reargued); *Colonel B. Ellis Phillips, Colonel Larry G. Stephens* (on briefs).

For Appellee: *Major Robert T. Mounts* (argued and reargued); *Colonel Julius C. Ullerich, Jr., Colonel James P. Porter, Colonel Merton F. Filkins, Major Alvin E. Schlechter, Captain James R. Van Orsdol* (on briefs).

Amicus Curiae on behalf of Appellee: *Commander T. C. Watson, Jr., JAGC, USN, Lieutenant Colonel D. A. Higley, USMC* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

In June 1977, the appellant was tried by special court-martial and, contrary to his pleas, was convicted of sale of marihuana at Bolling Air Force Base; sale of marihuana in Oxon Hill, Maryland; and sale of lysergic acid diethylamide (LSD), also in Oxon Hill, Maryland, in violation of Articles 134 and 92, Uniform Code of Military Justice, 10 U.S.C. §§ 934 and 892, respectively.[1] He was sentenced, accordingly, to a bad conduct discharge and reduction to the lowest enlisted grade. Both the convening and the supervisory authorities approved these results and the United States Air Force Court of Military Review affirmed. 4 M.J. 916 (1978).

This Court granted review of the appellant's claim that the court-martial lacked jurisdiction over the subject matter of the offenses alleged to have been committed in

---

1. The two marihuana transactions were charged as violations of Article 134 and the LSD sale allegedly controverted paragraph 4–4 of Air Force Regulation 30–2, Social Actions Program, dated November 8, 1976. A further allegation of sale of marihuana at Bolling Air Force Base was dismissed by the judge because of lack of sufficient evidence.

Oxon Hill, Maryland.[2]  After full and lengthy consideration of the positions of the parties reflected in their briefs and in their oral presentations before us,[3] we conclude that jurisdiction did properly vest in the appellant's court-martial to try him for the off-base offenses.[4]

## I

The record of trial reflects that between February 11 and March 20, 1977, a series of three drug transactions took place in the Washington, D. C., area between the appellant and Special Agent Reiordan of the Air Force Office of Special Investigations (OSI), who was posing as an airman from McGuire Air Force Base, New Jersey.

On February 11, Airman First Class O'Meara, an OSI informant, introduced Reiordan to the appellant in a building on the grounds of Bolling Air Force Base, Washington, D. C.  The meeting took place at 11:15 in the morning, just as the appellant was going on his lunch hour.  Ten minutes after the introduction, the appellant asked O'Meara if they could take care of some business that they had planned to conduct at a later time.  Accordingly, the three men left the building and walked to a parking lot, still on base, where the appellant sold O'Meara a plastic baggie containing a small block of hashish.  Reiordan then gave O'Meara $35.00 to pay for the hashish. Reiordan represented to the appellant that he was enroute back to McGuire AFB, returning from leave in Virginia, and that he was interested in purchasing drugs for resale at McGuire.  It does not appear, however, that any firm arrangements were made.

The next transaction took place almost a month later, on March 4, after a chance meeting in the apartment of Airman Antle

in Oxon Hill, Maryland, a Washington, D. C. suburb several miles from Bolling AFB. Reiordan had ventured to Antle's apartment in the course of a separate investigation in order to purchase a quarter pound of marihuana; but the marihuana was not available.  Meanwhile, however, the appellant, who lived in the same apartment complex as Antle, happened to come into the apartment to use Antle's telephone; and, while there, he asked Reiordan if the latter wanted to buy an ounce of Colombian marihuana.  Thereupon, the appellant, Reiordan, and O'Meara walked to the appellant's apartment where Reiordan bought approximately 20 grams of the marihuana from the appellant for $27.00.  None of the three was in uniform; the sale occurred between 5:00 and 6:00 in the evening.  Again, Reiordan indicated a continuing wish to purchase drugs for resale back at McGuire AFB.

The third and final transaction also occurred at the appellant's apartment, on March 20.  Reiordan had gone there to "firm up" a deal which had been discussed at prior meetings for his buying 5 to 10 pounds of marihuana from the appellant to be taken back to McGuire AFB for resale to servicemen there.  Also present were the appellant's wife, a civilian female introduced as "Sandy," and O'Meara.  The meeting took place between 2:00 and 3:00 in the afternoon and no one was in uniform.  The appellant and Reiordan discussed the details of the sale, and Reiordan asked whether the appellant could get him some samples to take back with him.  During the discussion, the appellant initiated a conversation about LSD, indicating that he was going out to obtain some "samples" for someone he knew.  Reiordan asked the appellant to get him some, too.  After a short delay, during which both parties left and returned, the

2.  There is no contest on the jurisdiction of the court-martial to try the appellant for the other offense, which occurred within the confines of a military installation.  See *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

3.  This case initially was argued before Judges Fletcher and Cook on January 16, 1980, but, on

order of this Court, it was reargued on June 9, 1980.

4.  Another issue going to the admissibility of the laboratory report of the nature of the substances without the in-court testimony of the chemist was decided adversely to the appellant's position in *United States v. Strangstalien*, 7 M.J. 225 (C.M.A.1979).

appellant sold Reiordan four small orange tablets, which he stated were LSD, for $10.00. Reiordan told the appellant that he would take the tablets back to McGuire AFB to sell to certain selected people there who were regular LSD users; Reiordan indicated that, based on their reports as to the quality of the tablets, he might place another order with the appellant for a larger quantity to sell at McGuire AFB.

There was testimony at trial that the local civilian police were informed of the OSI activities off base and that they had participated in a surveillance on one occasion during the investigation. Another OSI agent testified that the Maryland police were interested in and cooperative with the investigation, but there is no evidence of record as to the interest of the civilian prosecutorial authorities.

## II

In view of Reiordan's professed purpose of introducing drugs into McGuire Air Force Base, a military installation, we believe that our existing precedents support jurisdiction. However, appellate government counsel have urged us to go further, reconsider our more recent precedents on this subject, and determine whether court-martial jurisdiction would exist even in the absence of an accused's knowledge or belief that drugs which he is selling will be taken onto a military post. In view of the number of drug-related cases raising jurisdic-

tional issues, it seems appropriate that our discussion here should extend beyond the specific facts of the case at bar.

We begin with the 1969 landmark case of *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), where the Supreme Court of the United States[5] held that a court-martial lacked jurisdiction over the subject matter of an offense charged against a service member[6] unless that offense was "service connected." *Id.* at 272, 89 S.Ct. at 1690. In so concluding, the Court recognized that Art. I, § 8, cl. 14 of the Constitution gives Congress power to "make Rules for the Government and Regulation of the land and naval Forces" and that the Constitution itself acknowledges "that the exigencies of military discipline require the existence of a special system of military courts in which not all of the specific procedural protections deemed essential in Art. III trials need apply." *Id.* at 261, 89 S.Ct. at 1685. For instance, the Court pointed out that "[t]he Fifth Amendment" to our national charter "specifically exempts 'cases arising *in the land or naval forces,* or in the Militia, when in actual service in time of War or public danger' from the requirement of prosecution by indictment and, inferentially, from the right to trial by jury. (Emphasis supplied.) *See Ex parte Quirin*, 317 U.S. 1, 40, 63 S.Ct. 1, 16, 87 L.Ed. 3." *Id.* However, assuming "that an express grant of general power to Congress is to be exercised in harmony with express guarantees of the Bill of Rights,"

---

5. The vote of the Court was 5 to 3, with Justice Douglas writing for the Court, joined by Chief Justice Warren and Justices Black, Brennan, and Marshall. There was a strong dissenting opinion issued by Justice Harlan, in which Justices Stewart and White joined. Justice Fortas had resigned from the Court on May 14, 1969, less than three weeks before the decision was handed down on June 2, 1969. The opinion dealt with offenses committed within the United States in time of peace.

6. The Supreme Court already had determined, in a series of cases several years before, that status as a member of the armed forces was a constitutional predicate to the exercise of court-martial jurisdiction over the person.

Thus, no jurisdiction existed to try a discharged soldier for an offense allegedly committed while he was on active duty, *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955); nor over civilian dependents accompanying military members overseas, either for capital crimes, *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1140 (1957), or for noncapital crimes *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); nor over civilian employees of the armed forces overseas—again, whether charged with capital crimes, *Grisham v. Hagan*, 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960), or with noncapital crimes, *McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960).

*id.* at 273, 89 S.Ct. at 1691, the Court determined: [7]

If the case does not arise *"in the land or naval forces,"* then the accused gets *first,* the benefit of an indictment by a grand jury and *second,* a trial by jury for a civilian court as guaranteed by the Sixth Amendment and by Art. III, § 2, of the Constitution.

The standard for measuring whether an offense falls within Congress' constitutional power to prescribe rules for the land and naval forces is whether the offense is, somehow, "service connected."

Faced with this new jurisdictional requirement that an offense be "service connected," tribunals administering military justice—from this Court on down—struggled to understand this unfamiliar standard. What does "service connected" mean? Prior to the use of that phrase by the Supreme Court in *O'Callahan,* it never had appeared in any opinion of this Court; and it had appeared only once, in a wholly unrelated context, in an opinion of a Board of Review. *See United States v. Kelley,* 22 C.M.R. 723, 724 (CGBR 1956). Congress had used the term several times, but chiefly in the area of retirement benefits and disability pay. Because of the intent to be generous in awarding such benefits, service connection had been broadly construed in this context. On the other hand, the Supreme Court in *O'Callahan* left no doubt that in its application to court-martial jurisdiction the interpretation of the term "service connected" should be much less expansive.

This Court attempted promptly to put flesh on the skeleton of the term "service connected." *See United States v. Prather,* 18 U.S.C.M.A. 560, 40 C.M.R. 272 (1969); *United States v. Borys,* 18 U.S.C.M.A. 545, 40 C.M.R. 257 (1969). In each of these cases, it was found that the *O'Callahan* test of service connection had not been met, so the respective courts-martial lacked jurisdiction over the offenses charged.

The result was to the contrary when one week later this Court handed down its first *O'Callahan* ruling in a case involving a drug offense. *United States v. Beeker,* 18 U.S.C. M.A. 563, 40 C.M.R. 275 (1969), held that use or possession of marihuana and narcotics, whether on or off post, "has singular military significance which carries the act outside the limitation on military jurisdiction set out in the *O'Callahan* case." *Id.* at 565, 40 C.M.R. at 277. This decision was to set the tone for resolving subject-matter jurisdiction over drug cases for the next several years.

In the meantime, the Supreme Court itself had tried to give further substance to the ghost of the term "service connected." In *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), a unanimous opinion of the Court first observed that the case then at hand, like O'Callahan's,

falls within the area of stress between the constitutional guarantees contained in the Constitution's Art. III, § 2, cl. 3, in the Sixth Amendment, and possibly in the Fifth Amendment, on the one hand, and, on the other, the power vested in the Congress, by the Constitution's Art. I, § 8, cl. 14, "To make Rules for the Government and Regulation of the land and naval Forces," with its supportive Necessary and Proper provision in cl. 18, and the Fifth Amendment's correlative exception for "cases arising in the land or naval forces."

*Id.* at 362–63, 91 S.Ct. at 654. The Court then stated: [8]

We stress seriatim what is thus emphasized in the holding [of *O'Callahan* as factors for resolving the service-connection question]:

1. The serviceman's proper absence from the base.

2. The crime's commission away from the base.

3. Its commission at a place not under military control.

**7.** *O'Callahan v. Parker,* 395 U.S. 258, 262, 89 S.Ct. 1683, 1685, 23 L.Ed.2d 291 (1969).

**8.** *Relford v. Commandant, supra,* at 365, 91 S.Ct. at 655.

4. Its commission within our territorial limits and not in an occupied zone of a foreign country.

5. Its commission in peacetime and its being unrelated to authority stemming from the war power.

6. The absence of any connection between the defendant's military duties and the crime.

7. The victim's not being engaged in the performance of any duty relating to the military.

8. The presence and availability of a civilian court in which the case can be prosecuted.

9. The absence of any flouting of military authority.

10. The absence of any threat to a military post.

11. The absence of any violation of military property.

One might add still another factor implicit in the others:

12. The offense's being among those traditionally prosecuted in civilian courts.

Additionally, the Court stressed nine other considerations:[9]

(a) The essential and obvious interest of the military in the security of persons and of property on the military enclave. . .
(b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order. See *Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy*, 367 U.S. 886, [81 S.Ct. 1743, 6 L.Ed.2d 1230] (1961). . . . (c) The impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission. (d) The conviction that Art. I, § 8, cl. 14, vesting in the Congress the power "To make Rules for the Government and Regulation of the land and naval Forces," means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman-offender and turn him over to the civil authorities. The term "Regulation" itself implies, for those appropriate cases, the power to try and to punish. (e) The distinct possibility that civil courts, particularly nonfederal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community. . . . (f) The very positive implication in *O'Callahan* itself, arising from its emphasis on the absence of service-connected elements there, that the presence of factors such as geographical and military relationships have important contrary significance. (g) The recognition in *O'Callahan* that, historically, a crime against the person of one associated with the post was subject even to the General Article. . . . (h) The misreading and undue restriction of *O'Callahan* if it were interpreted as confining the court-martial to the purely military offenses that have no counterpart in nonmilitary criminal law. (i) Our inability appropriately and meaningfully to draw any line between a post's strictly military areas and its nonmilitary areas, or between a serviceman-defendant's on-duty and off-duty activities and hours on the post.

The Court then concluded, based on all this, that when the alleged offense is committed within or at the geographical boundary of a military installation and violates the security of a person or of property there, the crime is "service connected" within the meaning of that requirement in *O'Callahan*. While still not forsaking the *ad hoc* approach to this question dictated by *O'Callahan*, the Court opined:[10]

This delineation, we feel, fully comports with the standard of "the least possible power adequate to the end proposed" re-

9. *Id.* at 367–69, 91 S.Ct. at 656.

10. *Id.* at 369, 91 S.Ct. at 657.

ferred to in *O'Callahan*, 395 U.S., at 265, 89 S.Ct., at 1686.[11]

Five years later, this Court reexamined the approach it had used since *Beeker* to determine subject-matter jurisdiction over drug offenses. In *United States v. McCarthy*, 2 M.J. 26 (C.M.A.1976), the Court reaffirmed what had earlier been noted in *United States v. Moore*, 1 M.J. 448 (C.M.A.1976) —namely, that *Relford*, decided since *Beeker*, required a detailed, thorough application of its jurisdictional criteria in resolving the service-connection issue in cases tried by courts-martial. Concluding,[12] the *McCarthy* Court ruled: [13]

> To the extent that *United States v. Beeker*, 18 U.S.C.M.A. 563, 40 C.M.R. 275 (1969), suggests a different approach in resolving drug offense jurisdictional questions, it no longer should be considered a viable precedent of this Court.

Over the next few years, a majority of this Court applied strictly the 12 jurisdictional criteria of *Relford* in determining service connection—or lack thereof—of drug offenses tried by court-martial. Just over one year after the decision in *McCar-*

*thy*, the Court handed down its opinion in *United States v. Alef*, 3 M.J. 414 (C.M.A. 1977), in which the legal analysis was prefaced with the observation that it was

> required to examine the issue of service connection in accordance with the criteria set forth by the Supreme Court in *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), in order to resolve questions of subject matter jurisdiction . . . This analytical process of carefully balancing the *Relford* criteria to determine whether the military interest in deterring the offense is distinct from and greater than that of the civilian jurisdiction, as well as whether this distinct military interest can be vindicated adequately in the civilian courts, must be completed on a case-by-case, offense-by-offense basis. *United States v. Hedlund*, 3 M.J. 162 (1976).

*Id.* at 416. Impliedly, the Court thereby rejected any hope the Government might have had that application of the *Relford* criteria would, somehow, permit a broad holding that drug offenses, *per se*, meet the service-connection standard.[14] While the

11. The *O'Callahan* Court was quoting there from *Toth v. Quarles, supra*, 350 U.S. at 23, 76 S.Ct. at 8.

12. In the process, the Court stated that just "because the recipient of the contraband was a soldier is insufficient, in and of itself, to establish service connection." *United States v. McCarthy*, 2 M.J. 26, 28 (C.M.A.1976). Less than three months later, the Court ruled in *United States v. Williams*, 2 M.J. 81, 82 (C.M.A. 1976), that where "the evidence of record supports but one conclusion, that the appellant purchased the hashish in the civilian community for his personal off-post, off-duty use," (footnote omitted), application of the jurisdictional criteria set forth in *Relford* resulted in a conclusion of no service connection. In the area of drug offense jurisdiction, these holdings were a marked departure from *Beeker*.

13. *United States v. McCarthy, supra* at 29.

14. The Court also rejected, as inconsistent with the dictates of *Relford*, several other jurisdictional theories which had been used by lower military appellate courts to sustain court-martial jurisdiction over drug offenses such as: That by violating a general regulation prohibit-

ing drug possession or use the appellant "had in some manner [created] a relationship between his actions and the war-making power" (*United States v. Alef*, 3 M.J. 414, n. 7 (C.M.A.1977)); that "as a violation of a [general] regulation, . . ., the offenses had been transformed automatically into ones which always relate to an individual's military duties" (*id.* at 417 n. 8); that if a civilian community has a "hands-off" approach to drug prosecutions, this, in and of itself, is sufficient to establish military jurisdiction (*id.* at 417 n. 10); that an offense committed within "commuter distance" of a military post was, thereby, a sufficient threat to the post, *per se*, as to warrant exercise of military jurisdiction (*id.* at 418 n. 12). As to any *per se* tie between a violation of a regulation and court-martial jurisdiction, this Court rejected the notion well before *Alef.* In *United States v. Castro*, 18 U.S.C.M.A. 598, 600, 40 C.M.R. 310, 312 (1969), we said:

> In our opinion, the existence of a general regulation declaring specified conduct as punishable, does not, standing alone, *per se* confer jurisdiction on a court-martial to try one accused of its violation. The conduct proscribed therein must be "service connected" within the meaning of *O'Callahan v. Par-*

Court indicated that it was "not unmindful of the serious drug abuse situation facing the armed forces and, indeed the nation," *id.* at 418, it nonetheless felt compelled to adhere to a strict application of the 12 *Relford* criteria to determine jurisdiction on an *ad hoc* basis, "despite possible misgivings or disagreements" it might have had with that approach.[15] *Id.* at 416 n. 4.

## III

Whether this Court should have been so slavish in applying these *Relford* criteria has not gone unquestioned, both by advocates before this Bench and by our lower appellate courts. It has been argued that the Supreme Court itself has implied that such an approach is no longer required, if it ever was,[16] in the following language from *Schlesinger v. Councilman*, 420 U.S. 738,

760, 95 S.Ct. 1300, 1314, 43 L.Ed.2d 591 (1975) (emphasis added; footnote omitted):

[The issue of service connection] turns in major part on gauging the impact of an offense on military discipline and effectiveness, on determining whether the military interest in deterring the offense is distinct from and greater than that of civilian society and on whether the distinct military interest can be vindicated adequately in civilian courts. These are matters of judgment that often will turn on the precise set of facts in which the offense has occurred. *See Relford v. U. S. Disciplinary Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971). *More importantly, they are matters as to which the expertise of military courts is singularly relevant, and their judgments indispensable to inform any eventual review in Art. III courts.*[17]

ker, supra. The reason is obvious, for to hold otherwise would be tantamount to giving to the military authority to regulate and punish conduct of servicemen in excess of that granted to Congress under Article I, section 8, clause 14 of the Constitution to "make Rules for the Government and Regulation of the land and naval Forces." Congressional power to regulate in this area is limited to those matters which are "service connected."

Accord, *United States v. Strangstalien*, 7 M.J. 225, 226 (C.M.A.1979). Thus, while charging a transaction as a violation of Article 92, as opposed to Article 134, obviates the need of proving that the conduct was prejudicial to the good order and discipline of the military, the method of charging has no *O'Callahan* jurisdictional ramifications.

15. While the Court has steadfastly applied the 12 *Relford* criteria in resolving subject-matter jurisdiction in all cases where jurisdiction was in contest, it has, nonetheless, on occasion found that one factor was so compelling in favor of jurisdiction as to be dispositive of the question. *See United States v. Strangstalien, supra* (formation of criminal intent on base, being equivalent to the formation of a contractual agreement on base, even with terms yet to be completed off base); *United States v. Chambers*, 7 M.J. 24 (C.M.A.1979) (where the transferee was a member of the military and he proposed immediately to return to the military installation in order to sell and use the contraband at a barracks party, the accused's conduct "demonstrated so flagrant a flouting of military

authority as to establish sufficient military significance in the commission of the offenses to justify the exercise of court-martial jurisdiction" (*id.* at 24)); *United States v. Cornell*, 9 M.J. 98, 99 (C.M.A.1980) (where "the underlying negotiations occurred on post").

16. *See, e. g., United States v. Williams, supra* at 83 (Cook, J., dissenting); *United States v. McCarthy, supra* at 29 (Cook, J., concurring in the result).

17. There was further indication in *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), that the Supreme Court was prepared to permit the military justice system more leeway than might have been tolerated by the *O'Callahan* Court, which had previously rather harshly questioned the ability of this system to address and resolve matters of constitutional magnitude:

While the Court of Military Appeals takes cognizance of some constitutional rights of the accused who are court-martialed, courts-martial as an institution are singularly inept in dealing with the nice subtleties of constitutional law.

*O'Callahan v. Parker, supra*, 395 U.S. at 265, 89 S.Ct. at 1687. This evaluation did not go uncriticized, as the Supreme Court itself recognized in *Relford v. Commandant, supra*, 401 U.S. at 357 n. 3, 91 S.Ct. at 651. But the *Schlesinger* Court set a different tone:

As we have stated above, judgments of the military court system remain subject in proper cases to collateral impeachment. But implicit in the congressional scheme embodied

In this spirit the Government in the case at hand forthrightly asks the Court to reconsider our approach to *O'Callahan* issues in cases involving drug convictions. Specifically, the Government states in its brief:[18]

> We hereby urge the Court to expressly overrule its decisions in *United States v. McCarthy*, 2 M.J. 26 (C.M.A.1976), *United States v. Williams*, 2 M.J. 81 (C.M.A. 1976), *United States v. Alef*, 3 M.J. 414 (C.M.A.1977), and their progeny, and to declare once again that "use of marihuana and narcotics by military persons on or off a military base has special military significance" as it did in *United States v. Beeker*, 18 U.S.C.M.A. 563, 40 C.M.R. 275 (1969).

It is not unreasonable for an appellate court to be asked from time to time to reexamine an important decision widely affecting the court system which it supervises. Indeed, more than a reexamination of the conceptual correctness of the original decision may appropriately be solicited. The law is not an end in itself; more properly it is a means to accomplish the ends of an ordered society. When change occurs in the conditions of that society upon which the law is based, the law, in turn, must respond thereto. As the Supreme Court said in *Funk v. United States*, 290 U.S. 371, 381, 54 S.Ct. 212, 215, 78 L.Ed. 369 (1933), "The public policy of one generation may not, under changed conditions, be the public policy of another. *Patton v. United States*, 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854, 867, 70 A.L.R. 263." *See Ohio v. Roberts*, —— U.S. ——, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *see also Reid v. Covert*, 354 U.S. 1, 43, 77 S.Ct. 1222, 1244, 1 L.Ed.2d 1148 (1957) (Frankfurter, J., concurring in the result).

Even constitutional law must be molded to the times. The Supreme Court had occasion to address this matter many years ago in *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 442–43, 54 S.Ct. 231, 242, 78 L.Ed. 413 (1934):

> It is no answer to say that this public need was not apprehended a century ago, or to insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time. If by the statement that what the Constitution meant at the time of its adoption it means to-day, it is intended to say that the great clauses of the Constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation. It was to guard against such a narrow conception that Chief Justice Marshall uttered the memorable warning: "We must never forget that it is *a constitution* we are expounding" (*M'Culloch v. Maryland*, 4 Wheat. 316, 407, 4 L.Ed. 579, 601); "a constitution intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs." Id., p. 415, [4 L.Ed. 579.] When we are dealing with the words of the Constitution, said this Court in *Missouri v. Holland*, 252 U.S. 416, 433, [40 S.Ct. 382, 383,] 64 L.Ed. 641, 647, 11 A.L.R. 984, "we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. . . The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago."

And to those who would criticize such treatment of the Constitution as impure, the Supreme Court explained in *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926):

> And in this there is no inconsistency, for while the meaning of constitutional guar-

---

in the Code is the view that the military court system generally is adequate to and responsibly will perform its assigned task. We think this congressional judgment must be respected and that it must be assumed that the military court system will vindicate servicemen's constitutional rights.

*Schlesinger v. Councilman, supra*, 420 U.S. at 758, 95 S.Ct. at 1313.

**18.** Supplemental Brief on Behalf of the United States under Rule 22(b), at 15–16.

antees never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the *meaning*, but to the *application* of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to *conform* to the Constitution, of course, must fall.

Accordingly, while the jurisdictional test of service connection may remain firm, its application must vary to take account of changing conditions in the military society. Indeed, the Supreme Court's enumeration in *Relford* of myriad factors and considerations relevant to service connection seems intended to promote flexible application of the concept, so that changing conditions can be responded to.

However, did the Supreme Court intend that each individual case be dealt with separately and that no classes of cases be recognized in which military jurisdiction exists? *Relford* implies that the *ad hoc* approach need not necessarily be taken to this extreme. There the Court itself ruled that offenses committed by a service person on a military installation, violative of the security either of the persons or the property thereon, are "service connected." In so doing, they acknowledged the "inability appropriately and meaningfully to draw any

line between a post's strictly military areas and its nonmilitary areas, or between a serviceman-defendant's on-duty and off-duty activities and hours on the post." 401 U.S. at 369, 91 S.Ct. at 657.

Therefore, while keeping in mind *Relford*'s commitment to an *ad hoc* approach to jurisdiction, we proceed to inquire whether under current conditions any classes of off-post drug offenses are subject to court-martial jurisdiction and what lines, if any, can "appropriately and meaningfully" be drawn in determining the existence of jurisdiction.

### IV

It has often been asserted, and as often acknowledged, that drug abuse in the military is a most serious problem.[19] *See Schlesinger v. Councilman, supra* 420 U.S. at 761 n. 34, 95 S.Ct. at 1315; *United States v. Alef, supra* at 418. Our military forces include large numbers of young persons who are major targets for drug vendors and the nature of whose lives may create a special vulnerability to drug use. And it is very difficult to predict where drugs will travel—and into whose hands—when they are possessed in substantial quantity or are being distributed by service personnel in the vicinity of a military installation.

As military equipment has become more sophisticated, there is the concomitant increased risk that an operator will be unable to handle the complicated weapons system with which he is entrusted and upon which his safety and that of others may depend.[20]

---

**19.** The House Select Committee on Narcotics Abuse and Control has found in part that "[t]here is a serious problem with drug abuse in the military" and that "[d]rug abuse constitutes a significant drain upon the military in both human and monetary terms". House of Representatives Select Committee on Narcotics Abuse and Control, 95th Cong., 2d Sess., Report on Drug Abuse in the Armed Forces of the United States (Comm.Print 1978) at 26. The extent of these problems becomes apparent when it is realized that in the calendar year 1978 in the continental United States, 19,217 Army drug offenders were identified; during the first half of calendar year 1979, 9,903 Army drug offenders were identified. Drug Abuse in

the Armed Forces of the United States: Oversight Update: Hearing Before the Select Committee on Narcotics Abuse and Control of the House of Representatives, 96th Cong., 1st Sess. (Comm.Print 1980) at 142.

**20.** The effects of marihuana and of LSD, the *two drugs involved in this* prosecution, are illustrative. According to the Supplemental Brief of the Government (see n. 18 *supra*) at 5–6:

Marihuana produces a dreamy state of consciousness in which ideas seem disconnected, uncontrollable, and freely flowing. Time, color, and spatial perceptions are distorted and enhanced. In general, there is an ex-

This risk, disturbingly, often cannot be obviated by keeping a person under the influence of a drug off the job for, unlike use of alcohol, there frequently are only marginally visible indications of the influence of drugs. Even when the user is not then under the influence, there may be dangerous psychological pressures on him [21] which, themselves, could affect his performance adversely. Moreover, all this may be said of the serviceperson performing what may be perceived as the most routine and mundane duty, for there is no individual in our modern armed forces whose performance may not touch others in a significant way.[22]

Without the maintenance of a credible armed force, the United States is at a serious military and geopolitical disadvantage. The need is overwhelming to be prepared to field at a moment's notice a fighting force of finely tuned, physically and mentally fit men and women—and satisfaction of that need is not compatible with indiscriminate use of debilitating drugs. There are, in short, abundant and persuasive grounds for giving weight to the representations made to the Congress by the country's military leaders that drug abuse by servicepersons is rampant and that the armed services must curtail such abuse through exercise of court-martial jurisdiction to the greatest extent legally permissible. *See* Reinstitution of Procedures for Registration Under the Military Selective Service Act: Hearing on S. 266 before the Subcommittee on Manpower and Personnel, Senate Armed Services Committee, 96th Cong. 1st Sess. (March 13, 1979) (Statements of General Lew Allen, Jr., Admiral T. B. Hayward, and General Bernard W. Rogers).

Recently, this Court also manifested its concern about the drug problem in the military when, in prescribing rules for searches at the gates to military installations, it stated:

Compared to the problems encountered with illegal aliens, which nevertheless resulted in the variable balance previously discussed, the drug problem in the military may not appear so significant. However, we have previously announced our view that "use of marihuana and narcotics by military persons . . . has special military significance" in light of the " 'disastrous effects [of these substances] on the health, morale and fitness for duty of persons in the Armed Forces.' " *United States v. Beeker*, 18 U.S.C.M.A. 563, 565, 40 C.M.R. 275, 277 (1969). We are, therefore, satisfied that the problem is serious enough that the need for deterrent measures is significant. "[T]he number of instances does not alone determine the danger and the

treme feeling of well-being, exaltation, excitement, and inner joyousness which has been termed a "high." There is some euphoria. However, these effects may be accompanied or followed by depression, panic states, fear of death, body image distortions, and hallucinatory phenomena, as well as a clinical picture consistent with a toxic psychosis. Many of the psychological effects seem related to the setting in which the drug is taken. Contrary to popular belief, marihuana does not increase intellectual functioning or creativity; in fact, there is some decrease in the objective and communicative abilities during the use of these drugs. Tolerance develops in frequent users, but not physical dependence, though heavy users may note some restlessness, insomnia, and craving during abstinence. The Merck Manual, 12th Edition, 1972, Chapter 7, pages 1414–15. When ingested or inhaled as smoke, marihuana may cause euphoria, delirium, hallucinations, weakness, hyporeflexia, or drowsiness. The Merck Index, 9th Edition, 1976, § 1749, page 222.

LSD, like other hallucinogenic drugs, has the following general effects which last one to four hours after ingestion: alternations in mood, sense of unreality, perceptual changes, and hallucinations. It may also produce acute anxiety, panic states, toxic psychoses, persistent mood changes, and prolonged psychotic states. Physiologically, it frequently causes pupillary dilation with weak reaction to light, nausea, retching, vomiting, and cramping muscular pains. Mild fatigue is noted after the drug has worn off. The Merck Manual, *supra*, Chapter 7, page 1416. It may produce "serious psychologic disturbances." The Merck Index, *supra*, § 5453, page 733.

21. *Id.*

22. In this way, drug offenses, through their debilitating effects, have a relevance to combat readiness that rape or robbery normally do not.

need to oppose it . . . ." *United States v. Unrue, supra* [22 U.S.C.M.A. 466] at 470, 47 C.M.R. [556] 560. *See also Hirabayashi v. United States*, 320 U.S. 81, 105, 106–107, 63 S.Ct. 1375, 1387–1388, 87 L.Ed. 1774 (Douglas, J., concurring).

*United States v. Harris*, 5 M.J. 44, 58 (C.M. A.1978).

To cope with this problem, Congress has available its war powers—whereunder it may "declare war," "raise and support armies," "provide and maintain a navy," and "make Rules for The Government and Regulation of the land and naval Forces."[23] These powers are broad—especially when bolstered by the Necessary and Proper Clause[24] and read together with the powers of the Executive.[25]

Furthermore, exercise of these powers does not require the existence of active hostilities. In 1936 the Supreme Court relied on Congress' war power to sustain the federal government's construction and operation of the Wilson Dam. *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936). In the Court's eyes, there was "ample support" for the District Court's finding that " 'maintenance of said properties in operating condition and the assurance of an abundant supply of electric energy in the event of war, constitute national defense assets.' " *Id.* at 328, 56 S.Ct. at 474. Under conditions currently prevailing in the world, an effective military force is an even more vital "national defense asset" than was the Wilson Dam in the 1930's. Presumably, then, the maintenance of such a force is a suitable end towards which Congress' war powers can be directed.

We recognize that the absence of actual hostilities was fatal to the government's reliance on the war power in *Reid* as a basis for trying *civilians* accompanying our arm-ed forces overseas. *Reid v. Covert, supra* 354 U.S. at 34–35, 77 S.Ct. at 1239–1240. But in considering the jurisdictional basis for trying *servicepersons*, a realistic view of the role of our military in the modern world minimizes any need for preoccupation with the presence or absence of actual hostilities.

The Supreme Court implied as much when it recently recognized the importance of combat readiness for our troops in *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). After observing that "[m]ilitary personnel must be ready to perform their duty whenever the occasion arises," *id.* 100 S.Ct. at 599, the Court emphasized that there are "special dangers present in certain military situations" which "may warrant" special "restrictions on the rights of" military persons. Moreover, "those restrictions necessary for the inculcation and maintenance of basic discipline and preparedness are as justified on a regular base in the United States . . . as on a training base . . . or a combat-ready installation in the Pacific." *Id.* 100 S.Ct. at 601 n. 14. The Court continued:

> Loyalty, morale, and discipline are essential attributes of all military service. Combat service obviously requires them. And members of the armed services, whenever they are assigned, may be transferred to combat duty or called to deal with civil disorder or natural disaster.

*Id.*

Surely, in the present-day world, considering the state of the communication and transportation arts, there is a fine line, indeed, between time of peace and time of hostilities. The power to raise and support an army and to maintain a navy and the power to declare war are meaningless unless the reliability and efficiency of the force can be assured in time of peace. Un-

---

**23.** U.S.Const., Art. I, § 8, cls. 11–14.

**24.** *Id.*, cl. 18.

**25.** Art. II, § 2, cl. 1, of the Constitution prescribes that "[t]he President shall be Commander in Chief of the Army and Navy of the United States . . . ." By this specific grant alone, the Drafters bestowed upon the President substantial implied powers in carrying out congressional guidelines. *See United States v. Ezell*, 6 M.J. 307 (C.M.A.1979). *See also* Art. II, § 1 cl. 1: "The executive Power shall be vested in a President of the United States."

der those circumstances, we do not believe that, as to the question now before this Court, the line between hostility and tranquility is a meaningful one in defining the extent of permissible exercise of the war powers.

### V

In considering how Congress may exercise its war powers to interdict the "commerce" in drugs which affects military personnel and installations, it is instructive to review cases which have interpreted Congressional power under the Commerce Clause—which authorizes regulation of commerce "among the several States." U.S.Const., Art. I, § 8, cl. 3. We find that, although the Commerce Clause omits any grant of power over intrastate commerce, the Supreme Court has repeatedly held over a span of years that under appropriate circumstances Congress may legislate with respect to transactions local and intrastate in nature. Thus, in *United States v. Darby,* 312 U.S. 100, 118, 61 S.Ct. 451, 459, 85 L.Ed. 609 (1941), the Court declared that the power of Congress over interstate commerce "extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate and,[26] the exercise of the granted power of Congress to regulate interstate commerce." *See Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964). Accordingly, in regulating interstate commerce, Congress may regulate "activities intrastate which have a substantial effect on the commerce or the exercise of the Congressional power over it." *United States v. Darby, supra,* 312 U.S. at 119–20, 61 S.Ct. at 459–60 (footnote omitted). *Accord, Weiss v. United States,* 308 U.S. 321, 327, 60 S.Ct. 269, 271, 84 L.Ed. 298 (1939); *NLRB v. Jones & Laughlin*

*Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937).

Moreover, "Congress . . . may choose the means reasonably adapted to the attainment of the permitted end, even though they involve control of intrastate activities." *United States v. Darby, supra* 312 U.S. at 121, 61 S.Ct. at 460. For instance, where it is established that goods are likely to move *later* into interstate channels, Congress has the power under the Commerce Clause—coupled, of course, with the Necessary and Proper Clause—to regulate sales of such goods at local markets and warehouses. *See Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961); *Mulford v. Smith,* 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092 (1939); *Currin v. Wallace,* 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939). Further, in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the Supreme Court upheld provisions of the Agricultural Adjustment Act which extended federal regulation to production of crops *not intended in any part* for commerce, but wholly for consumption on the farm. After quoting a statement by Mr. Justice Holmes that "commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business," *id.* at 122, 63 S.Ct. at 88, the Court came to the conclusion that the wheat quota program which was being questioned was substantially related to the Congressional purpose of supporting prices in a problem industry, even though some wheat farmers were precluded from growing crops for their own consumption. The Court relied in part on *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942), which had upheld federal regulation of the marketing of local agricultural products.

The breadth of Congress' power under the Commerce Clause, read together with the Necessary and Proper Clause, is well described in this passage from *North Amer-*

---

**26.** Of course, the *end* itself must be legitimate. As the Supreme Court put it in *United States v. Butler,* 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936): "It is an established principle that the attainment of a prohibited end may not be accomplished under the pretext of the exertion of powers which are granted." *Id.* at 68, 56 S.Ct. at 320. This is equally true—perhaps, logically, even more so—where the means to the end are *implied.*

*ican Co. v. Securities and Exchange Commission*, 327 U.S. 686, 704–05, 66 S.Ct. 785, 796, 90 L.Ed. 945 (1946):

This is not to say, of course, that Congress is an absolute sovereign. It is limited by express provisions in other parts of the Constitution, such as Section 9 of Article I and the Bill of Rights. But so far as the commerce clause alone is concerned Congress has plenary power, a power which "extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations." *Minnesota Rate Cases (Simpson v. Shepard) supra,* 230 U.S. [352] at page 399 [33 S.Ct. [729] at page 739, 57 L.Ed. 1511].

This broad commerce clause does not operate so as to render the nation powerless to defend itself against economic forces that Congress decrees inimical or destructive of the national economy. Rather it is an affirmative power commensurate with the national needs. It is unrestricted by contrary state laws or private contracts. And in using this great power, Congress is not bound by technical legal conceptions. Commerce itself is an intensely practical matter. *Swift & Co. v. United States,* 196 U.S. 375, 398 [25 S.Ct. 276, 280, 49 L.Ed. 518]. To deal with it effectively, Congress must be able to act in terms of economic and financial realities. The commerce clause give it authority so to act.

This power permits Congress to attack an evil directly at its source, provided that the evil bears a substantial relationship to interstate commerce.

If the power over interstate commerce "is an affirmative power commensurate with the national needs," surely the same can be said of Congress' war powers. If Congress is permitted "to attack an evil directly at its source" under the Commerce Clause, can it not do as much in the exercise of its war powers? And if "[c]ommerce" is "an intensely practical matter" with which Congress may deal in terms of economic and financial realities" and "not bound by technical legal conceptions" when it exercises its power over interstate commerce, certainly it can do so when it exercises its war powers to block the "commerce" in drugs affecting service persons and military installations.

Usually, when drugs are possessed off-post by servicepersons or are sold by one serviceperson to another, it is reasonably foreseeable that at least some of the drugs will be brought onto a military installation. *See United States v. Alef, supra* at 418 n. 12. Indeed, in many instances the drugs will enter the military installation in their most lethal form—namely, when they are coursing through the body of a user. Also, on some occasions a serviceperson who observes his peers using drugs away from a military installation will be induced to emulate their conduct—but without their care to do so off post.

In construing the Commerce Clause, the Supreme Court has acknowledged that an evil may appropriately be attacked at its source. The drugs entering American military installations usually have their original source at some distant spot—typically in a foreign country. Then, through complicated channels of distribution, the drugs are funneled to the consumers—many of whom are servicepersons. However, most of the major suppliers and vendors of drugs are civilians and so are clearly beyond the scope of military jurisdiction. Indeed, they are often located in foreign countries where they are immune from prosecution by our Government.

Even so, drug suppliers are not completely invulnerable to attack. Their profits—which provide the inducement to enter or continue in the drug trade—depend on having a market for their wares. The vigorous prosecution of servicepersons who use or possess drugs will tend to deter acquisition of the drugs by *other* members of the military community—at least, if the conventional wisdom holds true. Cf. *United States v. Lania,* 9 M.J. 100 (C.M.A.1980).

Thereby, the market in drugs will be curtailed—with commensurate reduction in the profits anticipated by vendors. Hopefully, the diminution of their gains will force some drug sellers out of the market—at least, the military market—and other persons will decide not to become sellers in the military market in the first place.

Admittedly, the traffic in drugs presently is so pervasive—especially in and near military installations—that such measures may produce only minor inroads therein. Even so, in considering the scope of military jurisdiction, the prospect cannot be ignored that prosecution of those servicepersons who possess, use, and distribute drugs off post will tend to dry up sources of drugs for others who would use them on or near a military installation to the detriment of the military mission.

Cases like *United States v. Chambers*, 7 M.J. 24 (C.M.A.1979), clearly reach a correct result in holding that a serviceperson who transfers drugs to a person who plans, in turn, to distribute them on a military installation is subject to military jurisdiction. However, to make jurisdiction hinge on the announced intent of the transferee—and perhaps on the genuineness of that intent [27] —involves making distinctions that are too fine, just as the Supreme Court concluded in *Relford* that it would not be appropriate to distinguish between various types of on-base offenses in determining whether military jurisdiction exists.

■ In short, when we reflect on the broad scope of the war powers, the realistic manner in which the Supreme Court has allowed Congress to exercise power over commerce, and the flexibility which the Supreme Court intended for the concept of service connection so that, with the aid of experience, there could be a suitable response to changing conditions that affect the military society, we come to the conclusion that almost every involvement of service personnel with the commerce in drugs is "service connected." [28]

## VI

While the war powers of Congress are broad, they have limits—as do all its other powers. Thus, in *Reid v. Covert, supra*, they were not sufficient to persuade the Supreme Court that military jurisdiction should extend to civilian dependents overseas. Moreover, since subjection to the jurisdiction of a court-martial involves deprivation of at least two constitutional safeguards—namely, the right to grand jury indictment and trial by jury—the usually expansive application of the Necessary and Proper Clause is not permitted.[29]

---

**27.** Consistent with *Chambers* it might be argued that jurisdiction should not exist where, as in the case at hand, the transferee is an undercover agent who really has no intent of taking drugs on post, except to deliver them to law enforcement authorities. On the other hand, the "flouting of military authority"—which the Court relied on in *Chambers* to sustain military jurisdiction—might seem to hinge on the accused's intent, rather than on the transferee's.

**28.** Only under unusual circumstances, then, can it be concluded that drug abuse by a serviceperson would not have a major and direct untoward impact on the military. For instance, it would not appear that use of marihuana by a serviceperson on a lengthy period of leave away from the military community would have such an effect on the military as to warrant the invocation of a claim of special military interest and significance adequate to support court-martial jurisdiction under *O'Callahan*. Similarly, the interest of the military in the sale of a

small amount of a contraband substance by a military person to a civilian for the latter's personal use seems attenuated. *See United States v. Morley*, 20 U.S.C.M.A. 179, 43 C.M.R. 19 (1970).

**29.** The Supreme Court made it clear in *Reid v. Covert, supra*, that such expansive application of the Necessary and Proper Clause is not permissible when such reading comes into conflict with express constitutional safeguards designed to protect individual liberties from oppressive governmental practices. There, it declined to apply the broad Necessary-and-Proper-Clause standard of *McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819). The Court explained that in *McCulloch* the expansive application of the Necessary and Proper Clause was permitted in a situation where no specific restraints on governmental power stood in the way," while in *Reid*, Article III, section 2 and the Fifth and Sixth Amendments to the Constitution had to be read as caveats to the broad

Even so, the gravity and immediacy of the threat to military personnel and installations posed by the drug traffic and by drug abuse convince us that very few drug involvements of a service person will not be "service connected." [30]

Furthermore, without disparaging the safeguards of grand jury indictment and trial by jury, the absence of which in courts-martial was a cornerstone of the majority opinion in *O'Callahan*, we can appropriately note that: (a) to this point the Supreme Court has not considered indictment by grand jury to be so basic a guarantee as to merit incorporation in Fourteenth Amendment due process, *see Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884); (b) the right to trial by jury, while fundamental enough to merit incorporation for purposes of Fourteenth Amendment due process, *see Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), nonetheless was not so essential to a fair trial as to merit retroactive application, *see DeStefano v. Woods*, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968); and (c) the absence of these safeguards from trial by court-martial was not so incompatible with reliable fact-finding as

to require retroactive application of *O'Callahan, see Gosa v. Mayden*, 413 U.S. 665, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973). In short, we do not consider that the amenability to trial by court-martial of many off-post drug offenses that heretofore could not be tried in such a forum will subject the servicepersons involved to "drumhead justice." [31]

## VII

This analysis convinces us that a present-day reading and application of the *Relford* criteria is compelling in favor of court-martial jurisdiction over the vast majority of drug offenses committed by our servicepersons. Specifically, as already discussed, the fifth criterion—which relates to authority stemming from the war power—applies with great emphasis to drug offenses and their impact on the role of our modern armed force. In view of that role, the distinction this factor might otherwise imply between peace and hostilities is not meaningful as to drug offenses. As we construe the fifth *Relford* factor, it weighs heavily on the side of court-martial jurisdiction over such misconduct. This rationale also is closely related to the sixth criterion—any connection between the accused's military duties and the crime. Where a

exercise of the war powers through a sweeping application of the Necessary and Proper Clause. *Reid v. Covert, supra* 354 U.S. at 22, 77 S.Ct. at 1233. Instead, in reading together the war powers clauses and the Necessary and Proper Clause to determine if subject-matter jurisdiction exists over the offenses alleged, the presence of these express constitutional protections of the individual require that such jurisdiction be limited to *"the least possible power adequate to the end proposed."* *O'Callahan v. Parker, supra* 395 U.S. at 265, 89 S.Ct. at 1687. Lest any reader of *O'Callahan* have any doubt that the Court there applied this restrictive standard, the Supreme Court reiterated the *O'Callahan* holding in *Gosa v. Mayden*, 413 U.S. 665, 682, 93 S.Ct. 2926, 2937, 37 L.Ed.2d 873 (1973):

Rather, the broad guarantees of the Fifth Amendment right to grand jury indictment and the Sixth Amendment right to jury trial weighed heavily in the limitation of the exercise of court-martial jurisdiction to "*'the least possible power adequate to the end proposed,'*" *Toth v. Quarles*, 350 U.S. 11, 23, 76 S.Ct. 1, 8, 100 L.Ed. 8 (1955), a phrase taken

from *Anderson v. Dunn*, 6 Wheat. 204, 231, 5 L.Ed. 242 (1821).

30. *See* n. 27, *supra*. It should be noted that we do not in any manner affect the requirement articulated in *United States v. Alef, supra*, that the specification must adequately allege subject-matter jurisdiction in the court-martial. Of course, what factors are sufficient to do so may now have changed by virtue of this opinion.

31. The procedural safeguards available in courts-martial have been favorably compared with those in civilian criminal law administration. *See* Moyer, "Procedural Rights of the Military Accused: Advantages Over a Civilian Defendant," 22 Maine L.Rev. 105 (1970). Indeed, in announcing a warning requirement in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Chief Justice Warren relied at one point on the warning requirement prescribed by Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831. *Id.* at 489, 86 S.Ct. at 1635.

drug offense is at issue, this connection is usually quite tangible.

As to the eighth factor—"presence and availability of a civilian court in which the case can be prosecuted"—this Court must recognize certain realities. That prosecution of a particular case is declined by civilian authorities does not, of course, mean that a civilian court is not present and available. However, because many servicepersons are transients, local civilian law enforcement and prosecutorial authorities often have negligible interest in their activities, so long as those activities do not have direct impact on the local civilian community. Where civilian prosecutorial refusal to exercise jurisdiction is extensive and affects a whole class of offenses, this factor of "availability" of a civilian court may be important.[32]

Finally, whether the offense is a "threat to a military post"—the tenth criterion—encompasses, we believe, the threat of presently having on post persons who are unable to function normally because of drug abuse. As we already have discussed, this danger is very real and flows naturally and foreseeably from most drug offenses.

We are further supported in this conclusion by reflection upon four of the additional nine considerations of *Relford*:

(a) The essential and obvious interest of the military in the security of persons and of property on the military enclave. . . (b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order. . . . (d) The conviction that Art. I, § 8, cl. 14, vesting in the Congress the power "To make Rules for

the Government and Regulation of the land and naval Forces," means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman-offender and turn him over to the civil authorities. The term "Regulation" itself implies, for those appropriate cases, the power to try and to punish. (e) The distinct possibility that civil courts, particularly nonfederal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community.

*Relford v. Commandant, supra,* 401 U.S. at 367–68, 91 S.Ct. at 656.

We are now entirely persuaded that exercising "the least possible power adequate to the end proposed,"[33] it is necessary and proper in today's world that court-martial jurisdiction over most drug offenses be invoked as a proper exercise of the war powers. Nothing short of such exercise, we believe, will permit our nation's war machine to perform its constitutional duty to fight—and to be fully prepared to fight—to protect this country's national interests. In fact, anything short of such exercise would critically detract from this capability.[34]

## VIII

Applying this analysis in the case at bar, we conclude that the appellant's offenses were service connected within the meaning of that term in *O'Callahan.* The appellant stood ready, willing, and able to sell to a fellow serviceman large quantities of marihuana and drugs for that serviceman to take back to his installation for use

---

**32.** In *United States v. Carr*, 5 M.J. 390 (C.M.A. 1978), the dissenting judge went so far as to say he believed this factor is decisive. In the order of the Court, the majority did not indicate what weight it gave this element.

**33.** *See* n. 28, *supra.*

**34.** In *Schlesinger,* the Supreme Court, after discussing the seriousness of the drug problem in the military noted:

It is not surprising, in view of the nature and magnitude of the problem, that in *United*

States v. Beeker, 18 U.S.C.M.A. 563, 565, 40 C.M.R. 275, 277 (1969), the Court of Military Appeals found that "use of marihuana and narcotics by military persons on or off a military base has special military significance" in light of the "disastrous effects" of these substances " 'on the health, morale and fitness for duty of persons in the armed forces.' "

*Schlesinger v. Councilman, supra* 420 U.S. at 761 n. 34, 95 S.Ct. at 1314 n. 34. While we do not today return fully to the *Beeker* holding, what we do hold is fully supported by this observation.

and sale; and the instant charges stem from the initial steps in that process. Such conduct is inimical to a fit and ready armed force; and it is, under those circumstances, appropriately subject to prosecution and punishment by the military.

The decision of the United States Air Force Court of Military Review is affirmed.

Judge COOK concurs.

FLETCHER, Judge (concurring in the result):

I concur in the result.

The reason a majority of the Court retreated from the *per se* rule espoused in *United States v. Beeker*, 18 U.S.C.M.A. 563, 40 C.M.R. 275 (1969), was the decision in *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971). We stated in *United States v. Moore*, 1 M.J. 448, 450 (C.M.A.1976):

What *Relford* makes clear is the need for a detailed, thorough analysis of the jurisdictional criteria enunciated to. resolve the service—connection issue in all cases tried by court—martial. A more simplistic formula, while perhaps desirable was not deemed constitutionally appropriate by the Supreme Court. It no longer is within our province to formulate such a test.

Judge Cook, concurring in *United States v. Moore, supra* at 451, stated:

In my opinion, the Supreme Court perceived not only the military situs of the commission of an offense as justification for court—martial jurisdiction, but also the existence of a military relationship between the accused and the victim of his crime.

Earlier, the majority in *United States v. Uhlman*, 1 M.J. 419 (C.M.A.1976), found that the status of the victim, being military, was the first prerequisite to jurisdiction with the military.

What we have not done is ignore the Supreme Court of the United States and draw assumptions and/or presumptions from the fact that both parties were in the military. What we have done with consistency, where there is an evidentiary showing on the record that both parties were members of the military and other evidence once again on the record that the *Relford* requirements were met, was to hold there was jurisdiction for courts—martial.[1]

The majority states in the last sentence of their last footnote that "we do not today return fully to the *Beeker* holding," but I suggest the majority opinion is a homograft of *Beeker*. I would further suggest that the rationale, excluding the references to drugs, is viable as to any crime where both parties are members of the military.

I make one further observation. This case, along with *United States v. Courts*, 9 M.J. 285 (C.M.A.1980), and *United States v. Mack*, 9 M.J. 300 (C.M.A.1980), discloses to me a lessening of the requirement that the Government fulfill its obligation under the law to meet the letter of the law.

In this case it takes the calling of one additional witness, either the accused's immediate commanding officer or the victim's, and tendering to that person these two questions:

"Do you have an opinion as to whether the acts charged here had an effect on the efficiency of your unit?" If the answer is yes, then, "Please state what this effect is?"

Situs of the alleged acts becomes immaterial when the answer envelopes the *assumed effect of drugs* on the military, as set forth in the majority opinion.

In *United States v. Courts, supra,*[2] the calling of one additional witness could satis-

---

1. *United States v. Cornell*, 9 M.J. 98 (C.M.A. 1980); *United States v. Strangstalien*, 7 M.J. 225 (C.M.A.1979); *United States v. Cruz*, 5 M.J. 286 (C.M.A.1978); *United States v. Thomas*, 4 M.J. 96 (C.M.A.1977); *United States v. McCarthy*, 2 M.J. 26 (C.M.A.1976). I have not attempted to catalogue all the cases on this exact question.

2. *See United States v. Courts*, 9 M.J. 285 (C.M.A.1980) (Fletcher, J., dissenting).

**354**

fy the rule as to the foundation necessary for the evidence to be admissible.

In the case of *United States v. Mack, supra,*[3] it takes three additional lines on the form of acceptance of Article 15 discipline:

1. I do/do not desire to be counseled by an attorney as to my procedural rights.

_____
Signature

2. I talked with Lawyer _____ on _____.

_____
Signature

3. I understand my procedural rights as explained to me by Lawyer: _____.

_____
Signature

With these additions on the record, the letter of the law, in my view, would be met.

I concur in the result in this case, because the uncontroverted evidence on the record discloses that the appellant was told at the time of the purchase that the drugs were to be taken onto a military base. This conclusion follows the law[4] as set forth by this Court, and the Supreme Court of the United States.

**3.** *See United States v. Mack,* 9 M.J. 300 (C.M.A.1980) (Fletcher, J., dissenting).

**4.** *See* n. 1.